**In re IONOSPHERE CLUBS, INC. and Eastern Air Lines, Inc., Debtors.**

**Bankruptcy Nos. 89 B 10448 (BRL), 89 B 10049 (BRL).**

United States Bankruptcy Court, S.D. New York.

April 2, 1990.

See also, Bkrtcy., 111 B.R. 436.

Weil, Gotshal & Manges by Bruce R. Zirinsky, New York City, for debtors.

Sullivan & Cromwell by Robinson Lacy, New York City, for Airbus Lenders.

## MEMORANDUM DECISION ON MOTION AND CROSS–MOTION TO DETERMINE SECTION 1110 STATUS

BURTON R. LIFLAND, Chief Judge.

The dispute presented herein raises a novel question as to whether a party who advances funds for the purpose of financing the acquisition of aircraft which are to be included as part of a larger pre-existing floating collateral pool is entitled to the special benefits provided in § 1110 of the Bankruptcy Code.

## BACKGROUND

On March 9, 1989, (the "Petition Date") Eastern Air Lines, Inc. ("Eastern/Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code"). 11 U.S.C. §§ 101 *et seq.* Eastern operates as a debtor-in-possession under §§ 1107(a) and 1108 of the Code.

Prior to the Petition Date, Eastern was a party to numerous security agreements relating to aircraft engines, appliances and spare parts utilized in the conduct of Eastern's airline operations (the "Security Agreements"). Included among such Security Agreements is the Indenture of Mortgage dated October 1, 1963, as supplemented, modified and restated (the "Indenture"), between Eastern and The First National Bank of Boston ("FNBB"), as Trustee and successor by merger to the Old Colony Trust Company. This Indenture is the focal point of the current dispute.

In May 1989, Eastern sought declaratory relief requesting a determination that certain Security Agreements and their respective collateral are not subject to the provisions of § 1110 of the Code [1] (the Motion).

---

1. Section 1110 of the Code provides in pertinent part as follows:

   § 1110 Aircraft equipment and vessels.

   (a) The right of a secured party with a purchase-money equipment security interest in, or of a lessor or conditional vendor of,

   whether as trustee or otherwise, aircraft, aircraft engines, propellers, appliances, or spare parts, as defined in section 101 of the Federal Aviation Act of 1958 (49 U.S.C. 1301) ... that are subject to a purchase-money equipment security interest granted by, leased to, or con-

In its Motion, Eastern characterized several of the Security Agreements as "Non-§ 1110 Agreements". By order dated May 8, 1989, this Court granted the relief requested by Eastern in its Motion, except with respect to some of the parties to the Indenture and certain other Security Agreements who had filed objections contesting their "Non-§ 1110 Agreements" status. Subsequently, these parties have entered into various stipulations with Eastern preserving their rights to object to Eastern's characterization of their Security Agreements and voluntarily extending the sixty-day period under § 1110 during which Eastern may agree to perform all of its future obligations as they become due and owing and cure all outstanding defaults under such Security Agreements.

The Indenture is the operative document which established a mechanism whereby Eastern has borrowed sums of money evidenced by notes (the "Notes") through various credit and loan agreements. In consideration for such loans and advances, Eastern has secured the payment of such Notes with a floating collateral pool consisting of aircraft, aircraft engines and various spare parts (the "Floating Collateral Pool"). The Indenture provides that the principal and interest of all notes issued pursuant thereto is secured by a pool of all aircraft and aircraft equipment in which Eastern granted a mortgage or security interest to FNBB as Trustee. As of the Petition Date, the Floating Collateral Pool consisted of approximately 28 aircraft, 83 spare engines and various spare parts and had an approximate fair market value in excess of $820 million. The security interests in the respective aircraft were duly perfected by filings with the Federal Aviation Administration.

The Airbus Lenders [2] are the holders or agents for the holders of Notes issued by Eastern in the original principal amount of approximately $246.78 million and $220.74 million pursuant to (i) the credit agreements dated September 1, 1978 and March 31, 1981 (the "1978 Agreement" and the "1981 Agreement" respectively, collectively the "Agreements"). Pursuant to the Agreements, the funds obtained by Eastern through the issuance of the Notes thereunder (the "Airbus Notes") were applied to finance Eastern's acquisition 14 Airbus A300 aircraft and 9 Airbus A300 aircraft, respectively (collectively, the "Airbus Aircraft"). As of the Petition Date, the approximate outstanding aggregate principal amount of the Airbus Notes was $95.8 million.

Since notes were issued pursuant to and secured by the Indenture, the Airbus Notes constitute Notes thereunder which are secured by the Floating Collateral Pool and which at one point in time included all of the Airbus Aircraft. As of the Petition Date, only 11 Airbus Aircraft were part of the Floating Collateral Pool and subject to the Indenture, the remaining 12 Airbus Air-

---

ditionally sold to, a debtor that is an air carrier operating under a certificate of convenience and necessity issued by the Civil Aeronautics Board ... to take possession of such equipment in compliance with the provisions of a purchase-money equipment security agreement, lease or conditional sale contract ... is not affected by section 362 or 363 of this title or by any power of the court to enjoin such taking of possession, unless—
(1) before 60 days after the date of the order for relief under this chapter, the trustee, subject to the court's approval, agrees to perform all obligations of the debtor that become due on or after such date under such security agreement, lease or conditional sale contract ... and
(2) any default, other than a default of a kind specified in section 365(b)(2) of this title, under such security agreement, lease, or conditional sale contract ...—

(A) that occurred before such date is cured before the expiration of such 60-day period; and
(B) that occurs after such date is cured before the later of—
(i) 30 days after the date of such default; and
(ii) the expiration of such 60-day period. 11 U.S.C. § 1110 (1978).

**2.** The Airbus Lenders consist of Dresdner Bank, A.G., Bayerische Vereinsbank, Deutche Bank, A.G., Westdeutche Landesbank Girozentrale, Keditanstalt fur Wederaufbau (collectively, the German Banks"), Credit Lyonnais, Banque Nationale de Paris, Societe Generale, Banque Francaise du Commerce Exterieur (collectively, the "French Banks"), and Midland Bank PLC ("Midland").

craft having been previously released from the Floating Collateral Pool with the consent of FNBB. Thus, as of the Petition Date, the Airbus Notes were, and continue to be, secured by the Floating Collateral Pool and the post-Petition Date proceeds thereof, with an approximate fair market value in excess of $820 million.

Eastern submits that it was neither the intent nor the design of the parties to the Indenture and to the Agreements to grant the Airbus Lenders a purchase money equipment security interest ("PMESI") in the Airbus Aircraft. Instead, Eastern asserts that the Airbus Notes, along with the other Notes entitled to the liens and other benefits of the Indenture, are equally and ratably secured by the Floating Collateral Pool, which consists of the Airbus Aircraft, as well as prior-acquired and after acquired collateral. Accordingly, Eastern maintains that the Airbus Lenders are merely generally secured creditors of Eastern who are not entitled to the protections afforded by § 1110.

In contrast, the Airbus Lenders dispute Eastern's determination that the Airbus Aircraft are not subject to the provisions of § 1110. Consequently, the Airbus Lenders' on their own behalf and as agent and managing banks, objected to Eastern's Motion and filed a cross-motion (the "Cross-Motion") requesting that this Court enter an order, *inter alia,* (1) declaring that the security interests in the 11 Airbus Aircraft together with the engines originally installed thereon, to secure the respective series of Airbus Notes issued to finance Eastern's acquisition of those Aircraft are subject to § 1110 and (2) authorizing and directing Eastern either to cure all defaults and to maintain current payments on the said Airbus Notes in accordance with § 1110 or to surrender the 11 Airbus Aircraft to the holders of the Airbus Notes issued to finance their acquisition.

## ISSUE

Whether the Airbus Lenders hold a PMESI in the Airbus Aircraft thereby entitling the Airbus Lenders to the benefits afforded by § 1110 of the Code.

## DISCUSSION

Ordinarily, a bankruptcy court may enjoin, *inter alia,* the taking of possession by a lessor or holder of a purchase money security interest ("PMSI"). (*See* §§ 362 and 363 of the Code.) However, § 1110 limits this power, so that a holder of a PMESI in aircraft, aircraft engines and spare parts, will not be stayed from taking possession of the equipment, unless the trustee or debtor-in-possession satisfies the conditions stated for maintaining possession of the equipment enunciated in § 1110(a)(2) of the Code. 5 *Collier on Bankruptcy,* ¶ 1110.01(d) at 1110–24 (15th ed. 1984).

> [The legislative] history reveals that owners of aircraft were initially given protection of the sort provided now by section 1110 in 1957. Bankruptcy Act § 116(5) (added by Pub.L. No. 85–295, c. 681, 71 Stat. 617 (1957)). Before then, protections of this sort were available only to owners of railroad rolling stock. When aircraft owners were added in 1957, the protection they were given by the predecessor of Section 1110 was *limited* to transactions involving leases and conditional sales. It was not until the adoption of the Bankruptcy Code in 1978 that these protections were *expanded,* under Section 1110, expressly to include certain purchase money financing transactions. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 239–40, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6198–200.

*In re Braniff, Inc.,* 110 B.R. 980, 983 (Bankr.M.D.Fla.1990) (emphasis in original). Congress designed the extraordinary relief provided in § 1110 for certain financers of aircraft "in order to encourage investment in new equipment for air carriers." *In re Air Vermont, Inc.,* 761 F.2d 130, 132 (2d Cir.1985) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 238–39 (1977), 1978 U.S.Code Cong. & Admin.News 1978, pp. 5787, 5963, 6198); *see also, Seidle v. GATX Leasing Corp.,* 778 F.2d 659, 662 (11th Cir.1985). "In granting this protection, Congress excluded general creditors

secured by transportation equipment." Gerstell & Hoff–Patrinos, *Aviation Financing Problems Under Section 1110 of the Bankruptcy Code,* 61 Am.Bankr.L.J. 7 (Winter, 1987) (hereinafter "Gerstell") (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 240 (1977); 124 Cong.Rec.H. 11,102 (Sept. 28, 1978); 124 Cong.Rec.S. 17,419 (Oct. 6, 1978)). The expansion of the provision to include PMESI resulted from "changes in financing practices [which] made it necessary to protect different types of security interest in equipment and that under new section 1110 such interests would be protected 'to make financing forms more flexible and more consonant with modern law.'" *In re Airlift Int'l, Inc.,* 761 F.2d 1503, 1507 (11th Cir.1985) (quoting H.R. Rep. No. 595 95th Cong., 1st Sess. 240 (1977), U.S.Code Cong. & Admin.News 1978 at 6199).

■ Accordingly, this limited exception is available to (1) a holder of a PMESI in aircraft or a conditional vendor of aircraft and (2) a lessor of aircraft. *See,* Gerstell, *supra,* at 1. The Second Circuit has expressly noted:

> Since the statute is unambiguous on its face ..., and since this is not one of those "rare and exceptional circumstances [when there is] something to make plain the intent of Congress that the letter of the statute is not to prevail," the statute's literal meaning must be applied, and no condition ... may be superimposed on the requirements explicitly specified in order for § 1110 to apply.

*In re Air Vermont, Inc.,* 761 F.2d at 134 (brackets in original; citations omitted). *Accord, In re Braniff, Inc.,* 110 B.R. at 982. However, the terms in § 1110 must be narrowly construed and its requirements strictly fulfilled before a creditor may receive the protection it offers in order "to prevent secured parties or lessors from gaining the protection of the section unless the interest of such lessor or secured party is explicitly enumerated therein." 124 Cong Rec. H. 11,102 (daily ed. Sept. 28, 1978); 124 Cong.Rec.S. 17,419 (daily ed. Oct. 6, 1978); *In re Continental Airlines Corp.,* 57 B.R. 854, 857 (Bankr.S.D.Tex.

1985); 5 *Collier on Bankruptcy,* ¶ 1110.01(d) at 1110–24 (15th ed.1984).

Pursuant to § 1.5 of the Agreements, the Airbus Notes were "issued pursuant to and secured by" the Indenture. Each Airbus Note expressly provides that it is "secured by" the Indenture and that the "rights" of the Airbus Lenders with respect to the "the nature and extent" of their security are governed by the terms of the Indenture. Thus, the Indenture is the operative document in determining whether the Airbus Lenders possess a PMESI.

Eastern does not dispute that the funds advanced by the Airbus Lenders under the Agreements were for the purpose of financing Eastern's acquisition of the Airbus Aircraft. However, the fact that the Airbus Lenders hold aircraft, aircraft engines or certain other flight equipment as collateral pursuant to a financing agreement is not by itself conclusive that the Airbus Lenders are also entitled to § 1110 protection. It must be determined, *inter alia,* that the Airbus Lenders hold a PMESI in that collateral.

Since the Code does not define PMESI, legislative history, case law, and commentators suggest that courts *may* look to § 9–107 of the Uniform Commercial Code (the "UCC") for guidance. *See,* H.R.Rep. No. 595, 95th Cong., 1st Sess. (1977) *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6198; Gerstell, *supra,* at 10–11; *In re Airlift Int'l, Inc.,* 70 B.R. 935, 938 (Bankr.S.D.Fla.1987); *In re Braniff, Inc.,* 110 B.R. at 984. *See also,* 5 *Collier on Bankruptcy* ¶ 1110.01, at 1110–20 (rev. ed. 1988).

The UCC § 9–107 defines PMSI as follows:

> **A security interest is a purchase money security interest to the extent that it is**
> (a) taken or retained by the seller of collateral to secure all or part of its price; or
> (b) taken by a person, who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

A third party that lends money to a prospective buyer *may* qualify as a purchase-money lender under UCC § 9–107(b), if he can show that the money he lent was in fact used to acquire an interest in the collateral in question. Consequently, the Airbus Lenders assert that regardless of the fact that the aircraft became part of a larger floating collateral pool in which they are beneficiaries, because the proceeds of their loans were used to buy aircraft, their interests are "purchase money". This Court disagrees.

■ The general rule is if collateral secures debt other than its own price, it is not a PMSI. *In re Norrell,* 426 F.Supp. 435, 436 (M.D.Ga.1977) (quoting *In re Manuel,* 507 F.2d 990 (5th Cir.1975)). The Official Uniform Comment to § 9–107 provides that a security interest taken as security for or in satisfaction of a preexisting claim or antecedent debt is excluded from the purchase money category. Although it is undisputed that the money lent to Eastern helped it pay for specific planes, the loan was additionally secured by the collateral pool. Thus, the loan to the Debtor is secured by property other than that for which the loan had been advanced. In addition, the aircraft securing the Airbus Notes were also taken as collateral securing the antecedent debt owed *to the other lenders* of the Indenture who, the Airbus Lenders concede, are not entitled to § 1110 status [3]. Consequently, it is clear that the Airbus Lenders were never granted anything in the first instance that can be construed as a PMESI in the Airbus Aircraft. Rather, pursuant to the Indenture, FNBB, on behalf of the Airbus Lenders and other noteholders (the "Noteholders"), were granted a first lien on the Floating Collateral Pool.

Indeed, 2.1 of the Indenture provides: all Notes shall in all respects be equally and ratably secured by and entitled to the benefits of this Indenture *without priority or distinction* as between series or on account of the actual time or times of the authentication or maturity of the Notes, or any of them. (Emphasis Added.)

Moreover, § 5.10 of the Agreements expressly acknowledges that (i) the Indenture constitutes "a valid and perfected first priority security interest" in the Floating Collateral Pool, and (ii) the Airbus Lenders are entitled to the "benefits and security afforded" by the Indenture "equally and ratably" with the other Noteholders. Nowhere does the 1978 Agreement, the 1981 Agreement or the Airbus Notes refer to, directly or indirectly, anything that can be construed as a PMESI in the Airbus Aircraft.

As of the Petition Date, the Floating Collateral Pool subject to the Indenture consisted of the Airbus Aircraft, as well as an additional 17 aircraft, 83 spare engines, and various spare parts. Moreover, as of January 31, 1981, approximately 150 aircraft were part of the Floating Collateral Pool and subject to the Indenture. In addition to the Airbus Lenders, the Floating Collateral Pool equally and ratably secured the obligations of Eastern to approximately 38 domestic institutional investors and insurance companies involved in transactions totally unrelated to the Agreements but which pertain to the Indenture.

In the case of *In re Booker,* 9 B.R. 710 (Bankr.M.D.Ga.1981), the bankruptcy court held that no PMSI existed where the security agreement contained other collateral than the collateral for which the lender advanced funds. *Id.* at 711. Similarly, the Eleventh Circuit in *Southtrust Bank v. Borg–Warner ("Southtrust Bank "),* 760 F.2d 1240 (11th Cir.1985), held that "a floating lien is inconsistent with a PMSI" because a "PMSI requires a one-to-one relationship between the debt and the collateral." *Id.* at 1243.

In this instance, the Floating Collateral Pool securing the Airbus Notes includes substantial collateral other than the Airbus Aircraft. The approximate fair market value of the property and proceeds currently comprising the Floating Collateral Pool is

---

**3.** It should be noted that no other holder of notes secured by the lien of the Indenture has ever asserted entitlement to the benefits of § 1110.

in excess of $820 million, whereas the approximate outstanding principal amount of the Airbus Notes as of the Petition Date was $95.8 million. At each Airbus Lender financing, the aircraft became subject to the Trustee's lien to secure antecedent debt. There is also no dispute that at each such time, the Airbus Lenders, as Noteholders, became beneficiaries of the Trustee's lien on all of the preexisting collateral. In light of the existence of other collateral in addition to the aircraft purchased with the financing provided by the Agreements, a PMESI was never created.

The Airbus Lenders assert that collateral used to secure its purchase price along with securing antecedent debt does not destroy a PMSI if it is possible to distinguish between the two types of indebtedness. In this regard, the Airbus Lenders claim that Eastern has incorrectly based its arguments on the "transformation rule". The transformation rule examines whether a refinancing, in which purchase money debt is restructured or replaced with new debt, defeats PMSI status for the lien securing the refinanced debt. *See, In re Billings,* 838 F.2d 405 (10th Cir.1988); *Pristas v. Landaus of Plymouth, Inc., (In re Pristas )* 742 F.2d 797 (3d Cir.1984); *In re Matthews,* 724 F.2d 798 (9th Cir.1984).

Here, the question of whether to apply the "transformation rule" need not be confronted because the Airbus Lenders were never granted a PMESI in the first instance. Even assuming, *arguendo,* that a PMESI had been created at the beginning of the lending transaction, the PMESI is destroyed when PMESI collateral is commingled with non-PMESI collateral, either through (1) the inclusion of an "after acquired property clause" or "future advances" clause in the underlying security agreement or (2) consolidation of a PMSI debt with a non-PMSI debt as a result of refinancing. *See, Southtrust Bank,* 760 F.2d at 798; *In re Manuel,* 507 F.2d at 990; *In re Gillie,* 96 B.R. 689 (Bankr.N.D.Tex. 1989); *In re Hipps,* 89 B.R. 264 (Bankr.N. D.Ga.1988); *In re Snipes,* 86 B.R. 1006 (Bankr.W.D.Mo.1988); *In re Trotter,* 12 B.R. 72 (Bankr.C.D.Cal.1981).

The Airbus Lenders assert, however, that the above analysis is not necessarily correct if the presence of an allocation scheme that "determines the extent to which a particular item continues to secure its own price and the extent to which payment of other purchases is affected" exists. *See e.g., In re Pristas,* 742 F.2d at 801. In this regard, the Airbus Lenders rely on the minority of courts who adhere to the "dual status rule" which states, *with respect to consumer goods,* that if you have a floating collateral pool, such an arrangement "does not invalidate the PMSI if there is a method for determining the extent of the PMSI". *Id.* at 801; *see, e.g., In re Billings,* 838 F.2d at 410; *In re Staley,* 426 F.Supp. 437 (M.D.Ga.1977); *Geist v. Converse County Bank,* 79 B.R. 939 (D.Wyo. 1987); *In re Hemingson,* 84 B.R. 604 (Bankr.D.Minn.1988). The stated rationale behind the dual status rule is (i) to encourage security agreements that benefit both buyer and seller and to facilitate sales of consumer goods, *see, In re Linklater,* 48 B.R. 916, 919 (Bankr.D.Nev.1985), and (ii) to give effect to the parties original intent. *See, In re Billings,* 838 F.2d at 410. Thus, where "it is easy for the court to ascertain which items had been fully paid for and hence no longer served as collateral," the PMSI may remain intact. *Southtrust Bank,* 760 F.2d at 1243. However, "[w]ithout some guidelines, legislative or contractual, the court should not be required to distill from a mass of transactions the extent to which a security interest is purchase money." *Id.* at 1243 *(quoting In re Coomer,* 8 B.R. 351, 355 (Bankr.E.D.Tenn. 1980)).

The Airbus Lenders assert that because the debt incurred by Eastern with respect to each Aircraft is evidenced by a specified series of Airbus Notes, the Airbus Lenders can identify the particular indebtedness that Eastern incurred to purchase each Aircraft. Similarly, the Airbus Lenders assert that there is no difficulty whatsoever in determining how much of the debt secured by the A–300's was incurred to finance their purchase, and that Eastern's issuance of a separate series of Notes to finance its acquisition of each aircraft, immediately ev-

idences the PMESI. In reality, however, there is no scheme to allocate between collateral and debts other than the scheme provided in the Indenture.

The Indenture states clearly and unequivocally that the allocation between collateral and debt be equal and ratable among all Notes, without preference or priority. Therefore, the actual allocation system is in direct contradiction to the scheme advocated by the Airbus Lenders. It should also be noted that those cases cited by the Airbus Lenders which allowed for an allocation scheme dealt with a simple situation involving a sole consumer creditor who has interests in both PMSI and non-PMSI items. In this instance, however, the circumstances are quite different and even more complex. Here, the transaction under the Indenture also involves multiple parties most of whom have clearly not advanced money for the specific purpose of allowing Eastern to purchase the types of collateral enumerated in § 1110 of the Code.

Additionally, if this Court were to endorse the Airbus Lenders' allocation system, it would render the express terms of the Indenture meaningless. For example, § 10.10 of the Indenture provides that any rents, income or revenue produced by the operation, sale or transfer of any or all of property comprising the Floating Collateral Pool by FNBB upon an unremedied Event of Default (as defined in § 10.1 of the Indenture) is to be applied by FNBB "[t]o the payment of the whole amount then due and unpaid upon the Notes, for principal and interest, ... *without any preference or priority, ratably according to the amount so due.*" (Emphasis Added.)

The cases cited by the Airbus Lenders are also inapplicable to the instant situation because in each case, the lender initially had at the time of the initial financing an undisputed PMSI. Only by virtue of subsequent transactions did non-purchase-money security interests attach. Here, the purchase-money nature of the security interest was flawed from the inception of the loans.

In addition, almost all of the cases cited by the Airbus Lenders involved consumer debt, where the issue was primarily one of perfection of security interests; not a relevant issue in this instance under § 1110 of the Code. Moreover, it is not at all clear that a rule which applies to consumer goods cases ought to apply to security interests in aircraft equipment. In a situation involving the limited applicability of § 1110, as opposed to consumer goods, a lender who becomes generally collateralized by an existing and accreted equipment pool in return for an "equipment-specific" loan is not protected under § 1110. This is so for several reasons:

> First, it appears highly unlikely that a borrower who desired new property would ignore the most obvious means of financing its new equipment—the use of a purchase-money loan, conditional sale, or leveraged lease—and instead turn to a general secured loan. Second, even if such an arrangement were practical or necessary for independent business reasons, the use of already-acquired property as collateral for a loan, even an "equipment-specific" loan, appears to fall within the more traditional collateralized lending arrangements outside the protection of § 1110. While a lender could argue that the express use of the loan was within the scope of § 1110, the fact remains that on its face § 1110 only protects certain lending arrangements. The legislative history clearly indicated that generally secured creditors fall outside such protection.

Goldman, Album & Ward, *Repossessing the Spirit of St. Louis: Expanding the Protection of Sections 1110 and 1168 of the Bankruptcy Code*, 41 Bus.Law. 29, 53 (1985).

As previously mentioned, the extraordinary relief provided by § 1110 must be narrowly construed. In deference to the limited congressional purpose in which § 1110 was created, the broad interpretation of a PMSI when dealing with consumer goods is not applicable to the definition of PMESI within the meaning of § 1110. Consequently, the use of a Floating Collateral Pool and the exercise of future advances and after-acquired property clauses

found in the Agreements is inconsistent with the creation of a PMESI.

The Airbus Lenders also argue that the notion of being oversecured should not preclude the application of § 1110. However, the PMSI cannot exceed the price of what is purchased in the transaction where the security interest is created. *In re Manuel* 507 F.2d at 993; *Southtrust Bank*, 760 F.2d at 1243. In the present case, the approximate fair market value of the property and proceeds currently comprising the Floating Collateral Pool is in excess of $820 million, whereas the approximate outstanding principal amount of the Airbus Notes as of the Petition Date was $95.8 million.

Additionally, it appears that there are in effect three liens on the Floating Collateral Pool in addition to the Airbus Lenders' security interest. The first lien was granted to Lazard Brothers & Co. Limited ("Lazard") pursuant to the Indenture to secure its loans to finance Eastern's acquisition of certain aircraft engines. Lazard's lien is of equal rank to that of the Airbus Lenders and the Indenture provides that all proceeds of the collateral in the Floating Collateral Pool shall be shared pro rata by the Airbus Lenders and Lazard. The second lien secures one of Eastern's public bond issues. The third lien secures Eastern's obligations with respect to certain tax benefit transfers. The second lien is junior to the liens held by the Airbus Lenders and Lazard and the third lien is subordinate to them all.

The Airbus Lenders mistakenly assert that the Lazard's equal lien is of no import. They argue that the fact that the Aircraft secure both the financing used to purchase the collateral and the indebtedness to Lazard on a first shared lien bases would present an obstacle to the assertion of § 1110 rights only if it were not possible to distinguish between the two types of indebtedness. Thus, the Airbus Lenders contend that because the debt incurred by Eastern with respect to each Aircraft is evidenced by a specific series of Airbus Notes, the Airbus Lenders can identify the particular indebtedness that Eastern incurred to purchase each Aircraft. As discussed previously, however, such an allocation system does not exist and is counter to the Indenture's equal and ratable scheme.

The Airbus Lenders also maintain that the provisions of the Indenture requiring the Airbus Lenders to share any proceeds of their collateral with Lazard should not impair their rights pursuant to the explicit language of § 1110. The Airbus Lenders state that they recognize that if they had to take possession of the collateral because Eastern was unable or unwilling to cure any existing defaults, that they would be obliged to remit to Eastern any proceeds in excess of the outstanding balances on the related loans, to be held subject to their own and other applicable liens pending further order of this Court or the outcome of this case. They also assert that the sole result of such a scenario would be that the Airbus Lenders' "purchase money loans" will remain unsatisfied in part and the Lazard loans will be satisfied in part, in each case by the amount of the proceeds transferred to Lazard under the sharing provisions. However, the Airbus Lenders' statements are unpersuasive because they fail to consider the limited scope of the applicability of § 1110 and the precise nature of the Indenture. As stated previously, the legislative history of the Code requires § 1110 to be narrowly construed:

> This section protects a limited class of financers of aircraft and vessels and is intended to be narrowly construed to prevent secured parties or lessors from gaining the protection of the section unless the interest of such lessor or secured party is explicitly enumerated therein.

124 Cong.Rec.H. 11,102 (daily ed. Sep. 18, 1978); 124 Cong.Rec.S. 17,419 (daily ed. Oct. 6, 1978). *See also, In re Continental Airlines Corp.*, 57 B.R. 854 (Bankr.S.D. Tex.1985); 5 *Collier on Bankruptcy* ¶ 1110.01(d) at 1110–23 (15th Ed.1984).

The financing which the Airbus Lenders advanced to Eastern was provided not only pursuant to the Agreements but also pursuant to the Indenture. Under the Indenture, the Airbus Lenders have no direct security interest in the aircraft. Rather, only the Trustee holds the security interest

in these aircraft equally and ratably on behalf of *all* Noteholders. As explained by UCC § 9–105(1)(m):

"Secured party" means a lender, seller or other person in whose favor there is a security interest, including a person to whom accounts or chattel paper have been sold. *When the holders of obligations issued under an indenture of trust, equipment trust agreement or the like are represented by a trustee or other person, the representative is the secured party.* (emphasis added).

Moreover, in order to justify that the pro-rata treatment of Lazard does not destroy a PMESI, the Airbus Lenders by analogy claim that a hypothetical "assignee" of a PMESI would be entitled to the special treatment provided in § 1110. However such an analogy fails for several reasons. First, it is undisputed that Lazard is not an assignee of the Airbus Lender's rights but rather a party that has been part of a tri-party financing arrangement since its inception. Second, it is also undisputed that Lazard is not entitled to § 1110 treatment. Thus, the Airbus Lenders' "assignment" theory that the pro-rata sharing arrangement with Lazard is not contrary to either the legislative intent or the literal terms of § 1110, is not compelling.

As this Court observed at the hearing, the scheme urged by the Airbus Lenders leads to a bizarre result; all lenders secured by the Indenture would get the benefit of § 1110 because other lenders have provided the identical form of purchase money without collateral. However, the application of the statute to these financings would unquestionably be antithetical to the express limitations of the statute—to prevent secured parties or lessors from gaining the protection of the section unless the interest of such lessor or secured party is explicitly enumerated therein—by permitting persons who concededly hold no § 1110 rights to participate ratably with the Airbus Lenders in proceeds of the collateral.

The Airbus Lenders also assert that the junior liens of the Aircraft are immaterial to the application of § 1110. In this regard, the Airbus Lenders contend that it is not uncommon for PMESI collateral to be subject to junior liens, such as mechanic's liens, and the lender who extends financing in reliance on § 1110 may be unable to prevent the attachment of such junior liens. First, as discussed more fully below, the record is abundantly clear that the parties never intended to afford the Airbus Lenders § 1110 protection. Thus, it would be disingenuous for the Airbus Lenders to now assert that they bargained and designed the Agreements in reliance on future § 1110 protection. Second, in this instance, a PMESI was never originally created, and therefore, the issue of whether the attachment of a junior lien destroys an existing PMESI need not be considered.

Moreover, as to the issue of intent, the Airbus Lenders assert that it is immaterial that the Lenders did not assert that they had, or explicitly expressed an intention to obtain a PMESI before the commencement of this case. Although, the Airbus Lenders may be correct that a requirement that the parties must have intended § 1110 be applicable to the financing transaction cannot be read into the statute, the intent of the contracting parties is relevant when discerning whether a PMESI exists. *Brayton v. Pappas*, 52 A.D.2d 187, 383 N.Y.S.2d 723, 725 (4th Dept.1976). *See, Connelly & Blitzer Realty, Inc. v. Elwyn*, 111 A.D.2d 555, 489 N.Y.S.2d 427, 428 (3d Dept.1985) ("as is the case with any contract, a bond and mortgage instrument must be construed in accordance with the parties' intent, as expressed by the language they chose to employ, and where that language is clear and unambiguous, it must be given effect in determining that intent.")

As the uncontested testimony of Mr. McGuinness demonstrates, the loans from the Airbus Lenders were made on very favorable terms to induce the purchase by Eastern of Airbus Model A–300 aircraft, a European-developed and built aircraft. Eastern was the first major U.S. carrier to acquire these aircraft for its fleet. Additionally, as recited in the Agreements, the loans were subsidized by various European government guarantees. Thus, there was

little if no reason for the Airbus Lenders to seek to structure the financing to work as a PMESI. Moreover, given the substantial concessions from the Airbus Lenders, there was great incentive for Eastern to seek to structure the financing as generally secured, particularly where it could avail itself of the collateral values of the A–300 aircraft for other loans secured by the same collateral pool. Thus, the rationale of Congress for providing a narrow and limited exception to the automatic stay for certain financiers of aircraft "in order to encourage investment in new equipment for air carriers" was not a motivating factor in this instance. "Although financers place great reliance on these protective provisions in structuring today's complex and innovative aircraft project financings" Gerstell, *supra*, at 1, clearly, the Airbus Lenders did not rely on the extraordinary protections pursuant to § 1110 in formulating the financing terms in these transactions.

Also noteworthy is that the creation of a PMESI in favor of the Airbus Lenders would have violated the fundamental premise of the financing and a requirement of the Indenture—equal and ratable treatment among all Noteholders, without preference or priority. A principal purpose for obtaining a PMESI is to obtain priority over competing security interests in the same collateral. Indeed, in the commercial, as opposed to the consumer loan, context, it is the *only* tangible benefit. Official Comment UCC § 9–107; UCC § 9–312. Here, the express intent of the parties as demonstrated by the Agreements was for the Airbus Lenders' notes to be equally and ratably secured with the Notes held by other lenders to Eastern.

Finally, even if the Agreements can be construed to create a PMESI in favor of the Airbus Lenders, "§ 1110 merely states that the secured party's 'right ... to take possession ... in compliance with the provisions of a purchase-money equipment security interest ... is not affected by section 362 or 363 of this title ...'" *In re Airlift Int'l, Inc.*, 70 B.R. at 942. Hence, if the Airbus Lenders right to possession is not affected by the automatic stay, then it

may seek compliance with the Agreements. *Id.* However, in order for the Airbus Lenders to be able to take possession of the aircraft in question, the underlying agreements must afford the right of repossession to such lessor, conditional vendor or holder of the PMESI. *See, e.g., In re Air Vermont,* 761 F.2d at 132.

As discussed previously, the Airbus Lenders do not hold a security interest in the aircraft. The security interest is held by the Trustee under the Indenture and only the Trustee may enforce the remedies which are set forth in Article Ten of the Indenture. The Airbus Lenders have no right of repossession. Upon the occurrence of an Event of Default (as defined in § 10.1 of the Indenture), the Trustee (and not the Noteholders) acting on behalf of *all* Noteholders may repossess the aircraft in accordance with § 10.2 of the Indenture. Moreover, the Indenture, § 10.14, contains express limitations on suits under the Indenture by Noteholders. In particular, the Indenture provides

> that no one or more holders of Notes shall have any right by his or their action to affect or prejudice the lien of this Indenture or to enforce any right hereunder, except in the manner herein provided and that all proceedings to enforce any provision of this Indenture shall be instituted in the manner herein provided and for the equal benefit of all holders of Notes hereby secured.

Thus, even if the Airbus Lenders were correct in asserting that under these circumstances they have standing to enforce their rights under the Indenture, they may only do so for the benefit of all Noteholders, none of whom are entitled to the benefits of § 1110. Undeniably, however, the Airbus Lenders are not acting on behalf of all Noteholders. In fact, if the Airbus Lenders were successful on their Cross-Motion and allowed to repossess the 11 Aircraft, it would be to the detriment of all other Noteholders because there would be less collateral securing their interests. The Indenture clearly precludes such an event from occurring by providing that the Airbus Lenders cannot repossess the Aircraft

from the Floating Collateral Pool solely for their own benefit. The Airbus Lenders are subject to the benefits and burdens of their bargain. Therefore, in agreeing to secure their notes by the Indentures, as opposed to a separate security agreement, the Airbus Lenders have the benefit of a first lien on a larger collateral pool while relinquishing to the Trustee, on behalf of all Noteholders, any right to repossess that collateral. Consequently, the Airbus Lenders' inability to repossess their collateral further highlights the reasons why their financings are not within the purview of § 1110.

## CONCLUSION

Although the Airbus Lenders undeniably made "equipment specific" loans, they did not however, take back the kind of purchase money equipment security interests afforded protection under § 1110. Based upon the express terms of the operative documents executed in connection with the issuance and collaterlization of the Airbus Notes, it is clear that the Airbus Lenders do not, and were never intended to, possess a PMESI in the Airbus Aircraft.

The Airbus Lenders' Cross–Motion requesting that this Court enter an order (1) declaring that the Airbus Lenders' security interest in the Airbus Aircraft is subject to § 1110 of the Code and (2) authorizing and directing Eastern either to cure all defaults and maintain current payments of the Airbus Notes in accordance with § 1110 or to surrender the Airbus Aircraft to the Airbus Lenders, is hereby denied. Eastern's request for a determination that the Airbus Lenders are merely generally secured creditors of Eastern and are not entitled to the protections afforded by § 1110 of the Code, is hereby granted.

It is SO ORDERED.