In re IONOSPHERE CLUBS, INC. and Eastern Air Lines, Inc., Debtors.

FIRST NATIONAL BANK OF BOSTON, Banque Francaise Du Commerce Exterieur, Banque Nationale De Paris, Bayerische Vereinsbank, Credit Lyonnais, Deutsche Bank, A.G., Dresdner Bank, A.G., Kreditanstalt Fur Wiederaufbau, Midland Bank PLC, Societe Generale, Westdeutsche Landesbank Girozentrale and Lazard Brothers & Co., Ltd., Appellants,

v.

Martin R. SHUGRUE, Jr., as Trustee for Eastern Air Lines, Inc., Appellee.

Bankruptcy Nos. 89 B 10448 (BRL), 89 B 10449 (BRL).

No. 90 Civ. 4323 (RWS).

United States District Court, S.D. New York.

Jan. 17, 1991.

Choate, Hall & Stewart (Peter A. Fine, of counsel), Boston, Mass., for First Nat. Bank of Boston.

Sullivan & Cromwell (Robinson B. Lacy, of counsel), New York City, for European Lenders.

Weil, Gotshal & Manges (Bruce R. Zirinsky, Sharon Youdelman, Deryck A. Palmer, of counsel), New York City, for Martin R. Shugrue, Jr.

## OPINION

SWEET, District Judge.

A number of financial institutions holding promissory notes of Eastern Airlines have appealed from a ruling of the Bankruptcy Court, *In re Ionosphere Clubs, Inc.*, 112 B.R. 78 (Bankr.S.D.N.Y.1990), that certain security interests which they hold in equipment owned by Eastern Airlines, Inc. ("Eastern") are not exempted by § 1110 of the Bankruptcy Code, 11 U.S.C. § 1110, from the automatic bankruptcy stay. For the following reasons, the decision of the Bankruptcy Court is reversed.

*The Parties*

The appellants include a group of European Banks that lent money to Eastern to finance its purchase of a number of Airbus aircraft ("the Airbus Lenders"),[1] the First National Bank of Boston ("FNBB") as trustee under an indenture of mortgage which secures the loans, and Lazard Brothers & Co., Ltd. ("Lazard"), the holder of a number of other notes from Eastern.

Eastern is a corporation engaged in the business of providing air transportation service in interstate and foreign commerce. Eastern's principal place of business and it corporate headquarters are located in Miami, Florida. Eastern filed its petition under Chapter 11 of the Bankruptcy Code on March 9, 1989, and currently operates as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Code.

---

1. These banks are Banque Francaise du Commerce Exterieur, Banque Nationale de Paris, Bayerische Vereinsbank, Credit Lyonnais, Deutsche Bank, A.G., Dresdner Bank, A.G., Kreditanstalt Fur Weideraufbau, Midland Bank PLC, Societe Generale, and Westdeutsche Landesbank Gironzentrale.

## Statutory Scheme

 The filing of a bankruptcy petition ordinarily stays all actions by creditors of the debtor, including any action by a secured creditor to take possession of its collateral. 11 U.S.C. § 362. One exception to this provision is created by § 1110, which permits a secured creditor to enforce its rights to take possession of the debtor's property if the creditor has a particular type of security interest in a particular type of property. Aircraft owned by air carriers are one such type of property. A creditor who possesses a "purchase-money equipment security interest" ("PMESI") in the property is allowed to bypass the automatic stay and to take possession of the property in the event of default by the debtor. Section 1110 also provides a limited extension of time in which the debtor may elect to cure the default and to continue to make current payments in order to prevent the creditor from taking possession of the collateral. The Second Circuit has held that once § 1110's explicit conditions are met, a court may not impose further conditions on a creditor's exercise of the rights which the statute provides. *In re Air Vermont, Inc.*, 761 F.2d 130, 134 (2d Cir.1985).

## Proceedings Below

In May 1989, shortly after it filed its petition, Eastern moved for a declaration that a number of its credit agreements with various lenders were not subject to § 1110. The Airbus Lenders were the only parties to oppose that motion and to cross-move for a declaration that § 1110 required Eastern to continue to make payments on the loans or to surrender the collateral. FNBB, as trustee of the indenture which secured the loan, and Lazard, as holder of other notes secured by the same indenture, joined in opposing Eastern's motion and in the cross-motion. Eastern's motion was granted and the Airbus Lenders' cross-motion was denied in a memorandum opinion issued March 30, 1990, *In re Ionosphere Clubs, Inc.*, supra, 112 B.R. 78.

## The Facts

The loans and corresponding security arrangements which are the subject of this dispute are set forth in two sets of documents: the Indenture of Mortgage dated October 1, 1963, as supplemented, modified, and restated, between Eastern and FNBB as Trustee and successor by merger to the Old Colony Trust Company ("the Indenture"), and two Credit Agreements, one executed in 1978 and one in 1981 ("the Credit Agreements").

The Indenture was created in 1963 by Eastern as a means of collateralizing loans which it had taken out and which it planned to take out in the future. It grants each lender a security interest in the form of a primary mortgage on a "floating collateral pool" consisting of aircraft, aircraft engines, and various spare parts owned by Eastern ("the Collateral Pool"). The mortgage is held by FNBB as trustee of all of the lenders. The actual property in the pool changes over time as old property is removed from the pool and new property is added, subject to various limitations of the Indenture and the oversight of the trustee. All of the loans issued pursuant to the Indenture are secured by all of the property in the Collateral Pool, so that if Eastern defaults on any one of the loans FNBB may take possession of any or all of the property in the Collateral Pool, and to use that property to pay off all of the loans "ratably to the persons entitled thereto without discrimination or preference." The trustee holds the mortgage in the Collateral Pool "for the ratable benefit and security of each and every" lender, "without preference, priority or distinction."

The Credit Agreements set forth the specific terms of the loans which are the focus of this appeal. The Airbus Lenders extended credit to Eastern to enable it to finance the purchase of twenty-three Airbus Aircraft, fourteen under the loan made in 1978 and nine more under the 1981 agreement (collectively, "the Aircraft"). In 1978, the loans totaled $247 million, with another $221 million in 1981. Both the 1978 and 1981 loans were evidenced by a separate series of notes issued for each individual

Aircraft ("the Notes"). Both agreements provided that the Aircraft would become part of the Collateral Pool, and that the Indenture would secure payment of the loans. In addition, the Credit Agreements specified that if Eastern elected to remove any of the Aircraft from the Collateral Pool, it would be immediately required to prepay the outstanding amount of the note associated with that Aircraft. Because such prepayment would constitute a payment required under the Credit Agreements, a refusal to prepay would constitute a default under the terms of the Indenture.

Both the Indenture and the two Credit Agreements are governed by New York state law.

Prior to filing its bankruptcy petition, Eastern had sold twelve of the Aircraft which had been purchased with the proceeds of the 1978 loan and had prepaid the Notes associated with those Aircraft. Thus, as of the petition date there were eleven Aircraft remaining in the Collateral Pool. Eastern's outstanding indebtedness on the Notes associated with these Aircraft amounted to $95.8 million, while the market value of the property in the Collateral Pool totalled $820 million. At that time Lazard held all of the remaining loans secured by the Indenture ("the Non–Airbus Loans"), which had a total outstanding value of $118 million. After filing its petition, Eastern ceased making any payments on all of the loans secured by the Indenture.

The Airbus Lenders assert that this default, combined with § 1110, permits FNBB to seize the Aircraft and sell them. Under the Indenture's terms, the proceeds of such sale would be applied equally and ratably to all loans secured by the Collateral Pool, not just to the Notes held by the Airbus Lenders. Thus, because the Airbus loans constitute less than half of the total outstanding loans subject to the Indenture, if the appellants' cross-motion were successful the Airbus Lenders would receive less than half of the proceeds from the repossession and sale of the Aircraft.

Since filing the motion at issue here, Eastern has sold the remaining Aircraft pursuant to orders providing that the sales were without prejudice to the rights of the parties to this appeal under § 1110 and that the proceeds of the sales would be held in escrow and would be deemed the equivalent of the Aircraft for the purposes of this dispute.

## Discussion

### 1. Standard of Review

■ The Bankruptcy Court's decision is subject to *de novo* review in this Court. For the most part, the facts are not in dispute, and appellants challenge only the legal conclusions of the Bankruptcy Court. *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir.1987); *In re Beker Industries Corp.*, 89 B.R. 336, 342 n. 5 (S.D.N.Y.1988). Because the Bankruptcy Court's decision was based primarily on interpretation of the parties' written agreements, the issues raised in this appeal present questions of law. *In re Topco, Inc.*, 894 F.2d 727, 738 (5th Cir.1990).

### 2. The Airbus Lenders' Standing

■ At the outset, Eastern claims that the Airbus Lenders themselves have no security interest in any property in the Collateral Pool, because the only party with the power to seize property in the pool is FNBB, the trustee under the Indenture. However, § 1110 by its own terms applies to situations in which a trustee holds the security interest for the benefit of the actual creditor, thus the fact that FNBB is the party which holds the power to seize the collateral does not defeat the appellants' claims.

### 3. Section 1110

#### a. PMESI

■ There is no dispute that the Aircraft are equipment of the type subject to § 1110. The next question to be answered is whether the security interest in the Aircraft which is created by the Indenture and the Credit Agreements is a PMESI. Although the application of § 1110 depends almost entirely on whether a security interest is or is not a PMESI, the Bankruptcy Code offers no definition of the term. The

appellants assert, and the Bankruptcy Court agreed, that a PMESI may be defined by reference to the definition of a purchase-money security interest ("PMSI") contained in § 9–107 of the UCC. Eastern opposes this view, claiming that the addition of the term "equipment" in § 1110 reflects a congressional intent to distinguish the type of interest at issue there from a standard PMSI. However, Eastern offers no alternative definition of the term.

The appellants' contention is adopted, that a PMESI is simply a PMSI, as defined by § 9–107, in one of the limited types of "equipment" covered by § 1110. Therefore, as both parties agree that the Aircraft are such equipment, the question reduces to whether the security interests in the Aircraft created by the transaction are PMSIs.

### b. PMSI

■ Section 9–107 specifies that:

A security interest is a "purchase money security interest" to the extent that it is

(a) taken or retained by the seller of the collateral to secure all or part of its price; or

(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

Eastern does not dispute that the Airbus Lenders gave present consideration—the Airbus loans—in exchange for the security interests in the Aircraft. The Airbus Lenders undeniably took whatever security interest they acquired as security for those loans, not to secure any pre-existing obligations of Eastern. Nevertheless, the Bankruptcy Court held that no PMSI could have been created because the Aircraft were "taken as collateral securing the antecedent debt owed *to the other lenders.*" 112 B.R. at 83. This conclusion was based on the statement that "[t]he general rule is if collateral secures debt other than its own price, it is not a PMSI." *Id.*

However, the only authority cited in support of this "rule" concerned situations in which the "debt other than its own price"

was a debt owed to the same creditor as the one seeking PMSI status. *See In re Norrell,* 426 F.Supp. 435, 436 (M.D.Ga. 1977); *In re Manuel,* 507 F.2d 990 (5th Cir.1975). Moreover, as discussed *infra,* the more modern trend is to recognize that only the security interest which secures the non-purchase price debt is not a PMSI, but the interest which secures the purchase price debt retains its PMSI character. *See, e.g., Pristas v. Landaus of Plymouth, Inc.,* 742 F.2d 797, 800 (3d Cir.1984). Under this approach, the relevant question is whether the financing party takes an interest in the collateral as security for the purchase price obligation, not whether the purchased property also serves or will serve as collateral for other debts of the purchaser.

Therefore, the fact that the Aircraft became part of the Collateral Pool subject to the Indenture does not take the transaction outside the scope of § 9–107. At least at the time the loans were made, the Airbus Lenders possessed PMSIs in the Aircraft.

### d. Add-on clauses

The Bankruptcy Court also concluded that even if PMSIs had at one time been created in the Aircraft, they had been destroyed by the fact that the Aircraft were placed into the Collateral Pool and the Airbus Lenders received a mortgage in the entire pool under the terms of the Indenture. 112 B.R. at 84–86. This approach relies on the "transformation rule," which states that "[a] PMESI is destroyed when PMESI collateral is commingled with non-PMESI collateral." 112 B.R. at 84.

The general problem of analyzing loans which are secured by collateral other than or in addition to property which is purchased with the loan proceeds is addressed in McLaughlin, *"Add On" Clauses in Equipment Purchase Money Financing: Too Much of a Good Thing,* 49 Ford.L.Rev. 661 (1981). In this article, then-Professor McLaughlin discussed the various types of "add on" clauses which can affect purchase money security agreements. "Debt add on" clauses seek to use the purchased property to secure debts in addition to the purchase price, such as pre-existing debts from

the purchaser to the seller/financier, or debts created after the property is acquired. "Collateral add on" clauses extend the lender's security interest to collateral other than the purchased property. Finally, "debt collateral add on clauses" apply additional collateral to secure the purchase money debt and use the purchased property to secure debt other than that used for the purchase.

As the article explains, at the time of its publication several courts had adopted the position that an add on clause in a security agreement was enough to destroy any PMSI created by the agreement. *See, e.g., In re Simpson*, 4 U.C.C.Rep.Serv. 243 (Bankr.W.D.Mich.1966) (denying PMSI because of collateral add on clause); *In re Manuel*, 507 F.2d 990 (5th Cir.1975) (debt collateral add on clause destroyed PMSI). However, at least one New York court had rejected the view that the presence of a collateral add on clause would defeat a creditor's claim to have a PMSI. *National Cash Register Co. v. Mishkin's 125th St., Inc.*, 65 Misc.2d 386, 389, 317 N.Y.S.2d 436, 440 (N.Y.Civ.Ct.1970) ("Defendant had a purchase money interest [as] defined in Section 9–107 UCC. There is no basis for holding that the nature of its interest has been changed because it included an after-acquired property provision.").

Professor McLaughlin pointed out that the language of § 9–107, particularly the fact that it defined a PMSI as a security interest "to the extent" that it secures a purchase price debt, suggested that a security interest could have both PMSI and non-PMSI components. He concluded that, provided it is possible to determine what portion of the security interest secures purchase price debt, the existence of a "collateral add on" or a "debt collateral add on clause" should not eliminate the PMSI character of the interest. 49 Ford.L.Rev. at 691–92, 696.

This rule has been referred to as the "dual status" rule, because it allows a security interest to have both the status of a PMSI, to the extent that it is secured by collateral purchased with loan proceeds, and the status of a general security interest, to the extent that the collateral secures obligations unrelated to its purchase.

The important point here is that it is the security interest which has the dual status, not the loan which it secures. To the extent that the security interest gives the creditor the right to seize the collateral because of a default on the purchase price obligation, it is a PMSI, and to the extent that it allows seizure because of defaults on other loans, it is non-PMSI. If a dual status creditor is permitted to take priority in possession of the collateral because of a PMSI, the proceeds of sale of the collateral may only be applied to satisfy the purchase price debt. Any surplus would be returned to the debtor, to be held for the benefit of all creditors who held non-purchase money security interests in the collateral.[2]

This scheme requires that the debtor's payments be clearly allocated to each of its obligations, so that a default can be clearly traced to a particular loan. The creditor holding that loan would then have PMSI priority in whatever collateral was purchased with that loan, but only general secured creditor status with respect to the other collateral securing the loan. *See* 49 Ford.L.Rev. at 691–99.

Of course, where the obligations are owed to different creditors, there is no problem in allocating payments to each individual loan. The only complexity arises when the debtor takes multiple loans from a single creditor to finance multiple purchases, with each loan secured by security interests in all of the purchased property.[3] In this event, the debtor might make a

---

**2.** Thus the Bankruptcy Court's statement that "the PMESI cannot exceed the price of what is purchased", 112 B.R. at 86, is correct. Nevertheless, a creditor may very well possess a PMSI in collateral whose value exceeds the amount of the loan made to purchase it, such as when a buyer obtains financing for only a fraction of the purchase price.

**3.** This situation typically arises in consumer credit cases. *See, e.g., Pristas v. Landaus of Plymouth, Inc., supra,* 742 F.2d 797 (3d Cir. 1984); *In re Manuel, supra,* 507 F.2d 990; *In re Staley,* 426 F.Supp. 437 (M.D.Ga.1977).

single periodic payment to the creditor rather than separate payments on each loan. In the event of default, the creditor must be able to determine how much is outstanding on each loan, to determine how much of a PMSI exists in each of the purchased items. Provided that there is some method for doing so, the creditor retains its preferred standing with respect to the collateral. *See* 49 Ford.L.Rev. at 694; *Pristas, supra,* 742 F.2d at 801.

After discussing both the transformation rule and the dual status rule, the Bankruptcy Court stated that the dual status rule had been adopted by only a "minority of courts," and was inapplicable to this case because there was "no scheme to allocate between collateral and debts." 112 B.R. at 84, 85. In fact, the appellants have cited twelve cases decided since 1981 in which courts have chosen to follow Professor McLaughlin's analysis and to apply the dual status rule rather than the transformation rule. *See Pristas, supra,* 742 F.2d 797; *Geist v. Converse County Bank,* 79 B.R. 939, 942 (D.Wyo.1987); *In re McCall,* 62 B.R. 57, 59–60 (M.D.Ala.1985); *In re Hemingson,* 84 B.R. 604, 606–07 (Bankr.D. Minn.1988); *In re Linklater,* 48 B.R. 916, 919 (Bankr.D.Nev.1985); *In re Schwartz,* 52 B.R. 314, 316 (Bankr.E.D.Pa.1985); *In re Breakiron,* 32 B.R. 400 (Bankr.W.D.Pa. 1983); *In re Moore,* 33 B.R. 72, 73 (Bankr. D.Or.1983); *In re Russell,* 29 B.R. 270, 274 (Bankr.W.D.Okla.1983); *In re Stevens,* 24 B.R. 536, 538 (Bankr.D.Colo.1982); *In re Conn,* 16 B.R. 454, 457 (Bankr.W.D.Ky. 1982); *In re Gibson,* 16 B.R. 257, 266–69 (Bankr.D.Kan.1981); *see also In re Billings,* 838 F.2d 405, 408–10 (10th Cir.1988); *In re Brendlinger,* 116 B.R. 42, 43 (Bankr. W.D.Pa.1990); *In re Parsley,* 104 B.R. 72, 74 (Bankr.S.D.Ind.1988); *cf. In re Staley,* 426 F.Supp. 437 (M.D.Ga.1977).

■ The Bankruptcy Court's conclusion that there is no method of allocating Eastern's payments on the Notes to the particular loans is incorrect. Each series of Notes represents the loan used to finance the

purchase of one individual Airbus. Payment on the Notes reduces the outstanding amount of the loan by a predefined amount, and correspondingly reduces the extent to which the security interest in the Aircraft is a PMSI.[4]

■ As of the date of the petition, the $95.8 million outstanding on the Notes was secured by a general security interest in the entire $820 million worth of property in the Collateral Pool. Only a small portion of that security interest would qualify as a PMSI, namely that portion of the interest in each individual Aircraft which represented the unpaid balance of the Notes associated with that Aircraft. If any of the Aircraft had a value which was less than the outstanding purchase debt, the PMSI would cover the entire Aircraft. To the extent that an Aircraft's value exceeded the unpaid balance, the security interest in that Aircraft would be a general security interest. *See, e.g.,* McLaughlin, *supra,* 49 Ford.L.Rev. at 694–95.

■ Therefore, the Airbus Lenders possessed a PMSI in the Aircraft at the time of the loans in question, and the purchase money quality of the security interest is not eliminated by the fact that the debt was secured by other collateral in addition to the Aircraft. Because the Aircraft are the type of property specified in § 1110, the interests here qualify as PMESIs and thus § 1110's exemption from the automatic stay applies.

### 4. Lazard

■ The Bankruptcy Court also indicated that § 1110 would not apply because any recovery by the appellants would be split between the Airbus Lenders and Lazard, a party not involved in the purchase of the Aircraft. 112 B.R. at 85–87. The appellants argue that just as the holder of a PMSI may assign or transfer its security interest to a third party unrelated to the purchase without losing its preferred sta-

---

**4.** In this respect, the relative sophistication of the parties leads to a situation less complex than the typical consumer credit case, in which the consumer's account is "simplified," often to the consumer's detriment, by consolidating the loans into a lump sum payment which is not clearly allocated to the purchase price of each separate piece collateral.

tus, *see, e.g., In re Billings, supra,* 838 F.2d at 406; *In re Schwartz, supra,* 52 B.R. at 316 ("the fact that a purchase money security interest was assigned to one other than the original financier does not cause the security interest to lose it purchase money status"), the Airbus Lenders were free to share the benefits of their PMSIs in the Aircraft with other noteholders who were secured by the Indenture without destroying the purchase money quality of those interests.

This argument was rejected by the Bankruptcy Court because it found that "it is undisputed that Lazard is not an assignee of the Airbus Lender's [sic] rights" and "it is also undisputed that Lazard is not entitled to § 1110 treatment." However, the situation is at least analogous to a partial assignment of the benefits of the PMESI to Lazard, and Eastern has offered no justification for rejecting that analogy. Moreover, Lazard's status as the partial beneficiary of the Airbus Lenders' PMESIs is not affected by the fact that Lazard's own security interest in the Collateral Pool does not have purchase money priority.

### 5. *Intent of the Parties*

█ Finally, the Bankruptcy Court stated that

> the record is abundantly clear that the parties never intended to afford the Airbus Lenders § 1110 protection.... Although, the Airbus Lenders may be correct that a requirement that the parties must have intended § 1110 be applicable to the financing transaction cannot be read into the statue, the intent of the contracting parties is relevant when discerning whether a PMESI exists.

112 B.R. at 87 (citations omitted). Because the Indenture and the Credit Agreements by their own language created valid purchase money security interests in the Aircraft, it is unnecessary to look to external evidence of the parties' intentions in entering into the transactions.

### *Conclusion*

For the foregoing reasons, the Credit Agreements and the Indenture establish that purchase-money equipment security in-

terests in the Aircraft remaining in the Collateral Pool, to the extent of the outstanding balance due on the Airbus Notes. The Credit Agreements are thus subject to the terms of § 1110 of the Bankruptcy Code. Therefore, the Bankruptcy Court's decision is reversed, and the case is remanded with directions to enter judgment in favor of the appellants.

It is so ordered.