In re CARDINAL INDUSTRIES, INC. and the following substantively consolidated subsidiaries: Cardinal Industries of Florida, Inc., Cardinal Industries of Georgia, Inc., Cardinal Industries Services Corporation, Cardinal Industries Mortgage Company, Cardinal Parts Service Company, Cardinal Lodging Group, Inc., Cardinal Apartment Management Group, Inc., Cardinal Industries Development Corporation, Cardinal Industries of Florida Services Corporation, Cardinal Industries of Geor-

gia Services Corporation, Cardinal Furniture Leasing Company, Cardinal Retirement Management Group, Inc., Cardinal Acceptance Corporation, Maxim Building Corporation, Cardinal Advisory Group, Inc., Columbus Construction, Inc., Cardinal Securities Corporation, Cardinal Manufacturing, Inc., Camden Development Corporation, Cardinal Compensation, Inc., Cardinal Regulatory of Kentucky, Inc., Cardinal Regulatory of Michigan, Inc., Cardinal Regulatory of West Virginia, Inc., Cardinal Land Corporation, Cardinal Community Corporation, Cardinal Industries Insurance Agencies, Inc., CII of Pennsylvania, Inc., Cardinal Industries of Texas, Inc., Cardinal Industries Development Corporation of Texas, Inc., Cardinal Realty Company, Cardinal Industries Realty Corporation, Debtors.

Bankruptcy No. 2–89–02779.

United States Bankruptcy Court, S.D. Ohio, E.D.

Feb. 26, 1993.

Anthony W. Clark, Cathy J. Testa, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, Sally M. Henry, Skadden, Arps, Slate, Meagher & Flom, New York City, for Jay Alix, Former Chapter 11 Operating Trustee of Cardinal Industries, Inc.

Charles M. Caldwell, Alexander G. Barkan, Lawrence Hackett, Office of the Asst. U.S. Trustee, Columbus, OH.

James Bownas, Gen. Counsel, Cardinal Realty Services, Inc., Reynoldsburg, OH, James M. Lawniczak, Mark I. Wallach, Calfee, Halter and Griswold, Cleveland, OH, for Cardinal Realty Services, Inc.

## OPINION AND ORDER ON CHAPTER 11 TRUSTEE'S APPLICATION FOR COMPENSATION

BARBARA J. SELLERS, Bankruptcy Judge.

This contested matter requires the Court to construe § 330 of the Bankruptcy Code. Specifically the Court must determine the relative weight of the various components which produce "reasonable compensation" within the meaning of § 330 and whether the Trustee's request is appropriately calculated.

The United States Trustee ("UST") and the reorganized debtor, Cardinal Realty Services, Inc. ("CRSI"), objected to the fee application of Jay Alix, the former Chapter 11 operating trustee ("Alix"). Alix has requested compensation in the amount of $3,750,000, plus reimbursement of expenses. CRSI and Alix have resolved their differences and have agreed, subject to the Court's approval, to the allowance of compensation in the amount of $2,100,000 in cash and 50,000 shares of somewhat restricted CRSI stock. That amount is well within the statutory cap imposed on a trustee's compensation. See 11 U.S.C. § 326(a). The UST continues to assert its objection to Alix's application, however, and the Court heard this matter on January 28 and 29, 1993.

The primary thrust of the UST's argument is that Alix's fee is not reasonable because it exceeds his hourly rate multiplied by the hours spent plus a modest enhancement for success.

Section 330(a) of Title 11, United States Code, states in pertinent part:

§ 330(a) ... the court may award to a trustee ...

(1) reasonable compensation for actual, necessary services rendered by such trustee, ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title.

It can be seen that there are three factors the Court must examine to determine whether the compensation Alix seeks is reasonable. Those are:

(1) the nature, extent and value of the services;

(2) the time spent on the services; and

(3) the cost of comparable services in a non-bankruptcy setting.

Each factor will be considered in turn.

### A. The Extent, Nature and Value of the Services

The extent of Alix's services increased as the case progressed. Initially Alix's appointment on January 25, 1990 was as the operating trustee of Cardinal Industries, Inc. Within six months he was also the operating trustee of 33 subsidiary and affiliated corporations, all of which were in Chapter 11 before or at the time substantive consolidation of those corporate estates occurred. The corporate entities were involved in manufacturing modular housing units; servicing mortgages; syndicating partnerships; managing apartments, motels and retirement villages constructed from the modules; or supplying other relevant services for a vertically integrated modular housing business. The enterprise is referred to as Cardinal.

As the operating trustee of the consolidated Cardinal estates, Alix also managed the general partner position Cardinal had in approximately 900 limited partnerships. Each of those partnerships owned either an apartment complex, a motel, a retirement village or, in a few circumstances, raw land intended for such development. At the time of Alix's appointment, Cardinal was administratively insolvent, most of the partnerships were in default of their mortgage obligations, the books and records of the various entities were in disarray, and Cardinal Industries, Inc. had recently fired its bankruptcy legal counsel. Added to that confusion were serious declines in the value of the commercial real properties held by the partnerships and an impending crisis in the savings and loan industry which affected many of the lenders to the partnerships.

From that initial instability Alix led a restructuring, stabilizing and downsizing of the Cardinal enterprise. In September 1992 the corporate entities obtained confirmation of a consensual plan. Many of the partnerships are in pending Chapter 11 cases; some have reorganized outside of bankruptcy; others no longer own what was their primary asset.

The nature of Alix's services encompassed the role of a chief executive officer. He also had the fiduciary duties of a trustee under the Bankruptcy Code. Because the Cardinal enterprise had serious cash flow problems, poor cash needs estimation procedures, and unreliable books and records, Alix further served as the chief finan-

cial officer for the enterprise. He had assistance from staff of the various debtors and from principals and associates of his company, Jay Alix & Associates, Inc. The executive decisions for the entire enterprise were his, however. As chief executive officer, trustee and chief financial officer of corporate debtors who were also general partners, his decisions involved restructuring efforts with some 275 financial institutions which held mortgages against partnership properties. Alix's decisions also affected relationships with some 10,000 investors who had purchased limited partnership units from Cardinal. Although the UST alleged that certain essential managerial or fiduciary tasks had been delegated, no evidence of such delegation was produced. Alix performed as the CEO, CFO and fiduciary for a large and complex enterprise.

■ The value of Alix's services must be measured by the result of the restructure. Corporate Cardinal was able to continue in business on a smaller scale with an emphasis on the management of apartment complexes. The company paid all allowed administrative expenses through post-confirmation financing obtained by Alix as part of the settlement of litigation against Cardinal's primary prepetition lender. Unsecured creditors received stock in the reorganized company with a book value[1] of approximately $30,000,000. Those share interests are expected to increase in value over time.

In summary, the extent of Alix's services was wide-ranging; the nature of his services was complex and at a high level of responsibility; and the value of his services to the estate was the critical impact of those services on the reorganization effort.

B. The Time Spent on the Services

■ Alix served as operating trustee of Cardinal from January 1990 until confirmation of the consolidated corporate entities' plan in September 1992, a period of some 32 months. During that time he documented approximately 3500 hours spent directing Cardinal's activities. Some of that time

was estimated. In computing the lodestar component, the UST urges the Court to eliminate all time which Alix designated as estimated. The UST asserts that such time should not be considered because it was not recorded contemporaneously with the performance of the services. The estimated time averages about one hour each day over the 32 months of Alix's service.

The Court does not question the credibility of the estimate, however, and that time will be considered as part of the component of reasonable compensation which relates to the time spent on the services. In accepting that estimate, the Court is guided by its observations of Alix's activities during his tenure and by the understanding that strict time accounting in tenths of an hour is not the way chief executive officers normally work. Alix's testimony demonstrated that he devoted large parts of most days to Cardinal's problems in the beginning months of his appointment. Those time segments decreased as the case progressed.

The hours spent by Alix, when multiplied by his $450 hourly fee, produce a lodestar component of approximately $1,575,000. If the estimated time is eliminated, the lodestar component is $1,125,000.

C. The Cost of Comparable Services in a Non–Bankruptcy Setting.

■ When Congress enacted the Bankruptcy Reform Act in 1978, it decided to remove "spirit of frugality" as a factor in bankruptcy professional fees. 124 Cong. Rec. H 11,091–92 (daily ed. September 28, 1978) (Stmt. of Rep. Edwards). It was expected that such removal would encourage the best talent available to serve as estate professionals in cases where sophisticated expertise was needed. Certainly the restructure of a large and complex enterprise such as Cardinal exemplifies the need for services of a high skill level. It is uncontested that Alix possesses superior skills as a turnaround consultant and that he achieved an excellent result in a case where such results clearly were not expected at the time of his appointment.

1. This book value is calculated pursuant to Generally Accepted Accounting Principles.

Much of the testimony at the hearing concerned the compensation structure for persons involved in the "turnaround", "restructure", or management consultant business. Testimony established that performance-based or success-factor bonuses are a normal part of compensation arrangements for management restructure consultants and that such bonuses generally far exceed the time value of the consultant's services on a lodestar basis. Indeed, the time value component is referred to as the base salary, apparently payable to the consultant even if success is not achieved. There generally are benefit components to the compensation as well as incentive remunerations.[2] The range of compensation for services such as those rendered in this case is between $3,000,000 and $6,000,000. Two of the expert witnesses further considered comparable positions for consultants operating in the Chapter 11 setting. Those comparisons did not alter the expected range.[3] It can be seen that Alix's adjusted request of $2,100,000 is well below the expected range for comparable services either in or out of a bankruptcy setting.

The UST requested the Court to review fee applications in certain other cases. The Court performed that review, but the examples produced do not appear to the Court to be fairly comparable. Several of the cases were not successful reorganizations, but were orderly liquidations.[4] At least two had not yet reached the final fee application stage and involved only interim fee allowances at a time in the case where eventual distributions to creditors were uncertain.[5] In one case the keeping of time records was not required for a Chapter 7 trustee.[6] Moreover, none of the cited cases involved the enormous complications generated in Cardinal by the problems posed in the 900 affiliated partnerships. Even though the fee requests in the cited cases are lower than is Alix's request, the reasons for such differences are apparent from the nature and extent of the services provided in those cases and because, in the non-bankruptcy context, those fees generally would not command the success premiums which are such an important part of the compensation package for a turnaround consultant such as Alix. Therefore, the Court cannot find that the cases relied upon by the UST establish the cost of comparable services.

## CONCLUSION

■ This Court believes that Alix's adjusted fee request, in the amount of $2,100,000 plus a stock component, reasonably reflects the extent, nature and value of his services and is somewhat lower than the cost of comparable services in a non-bankruptcy setting. The request exceeds the strict lodestar component, however, when Alix's normal billing rate is employed. Therefore, the relative importance of each factor must be considered.

■ Although each factor set forth in 11 U.S.C. § 330(a)(1) is independent, each is also related to the others. Because benefit to the estate (or success of the endeavors) is always a primary focus of the analysis, the relationship between the factors need not be positively correlated. In some cases impressive results may be obtained with little effort and should be awarded generously. However, great amounts of time and energy with little result require much greater scrutiny. The focus must be on the result achieved and the benefit obtained for the estate. *Cle–Ware Industries, Inc. v. Sokolsky (In the Matter of*

---

**2.** See testimony of Brian T. Foley, transcript at 178–180.

**3.** See testimony of Terry L. Pasteris, transcript at 166–167. Alix Exhibit 24 (Report on Reasonableness of Fee Requested, p. 5, prepared by Brian T. Foley).

**4.** *See, e.g., Grabill Industries, Inc.,* Case No. 89 B 1639, Bankr.N.D.Ill. (U.S. Trustee Exhibit D—Steinberg Deposition Exhibits); *Ionesphere Clubs, Inc. (Eastern Airlines, Inc.),* 112 B.R. 78

(Bankr.S.D.N.Y.) (U.S. Trustee Exhibits F, G, H, I, & J.); *Midway Airlines,* Case No. 91 B 6449, Bankr.N.D.Ill., August 24, 1992 (U.S. Trustee Exhibits L & P).

**5.** *See In re Fred Sanders,* Case No. 87–06979–B, Bankr.E.D. Michigan (U.S. Trustee Exhibits M & N), and *Western Railway Co.,* Case No. 88 B 05141, Bankr.N.D.Ill. (U.S. Trustee Exhibit O).

**6.** *Midway Airlines,* Order on First Interim Trustee's Fees. (U.S. Trustee Exhibit P).

*Cle–Ware Industries, Inc.)*, 493 F.2d 863, 868 (6th Cir.1974). The enactment of § 330 of the Bankruptcy Code did not change either that focus or the factors set forth in *Cle–Ware* (other than the economy consideration). *See, In re Ezell,* 45 B.R. 13, 14 (Bankr.N.D.Tenn.1984) and *In re Crawford Hardware Inc.,* 82 B.R. 885, 887 (Bankr. S.D. Ohio 1987).

■ In examining each factor set out in 11 U.S.C. § 330(a)(1), the Court is cognizant that the value of the services, as measured by benefit to the estate, is the "yardstick for measuring" professional services. *Cle–Ware,* 493 F.2d at 868 [citations omitted]. While time actually spent and documented is certainly a factor to consider, it is not the only and perhaps not the most important, factor. The statutory factors are analyzed in light of the results obtained which are of benefit to the estate.

In addition, the Court believes that the risk of nonpayment, the magnitude of the task to be performed, and the risk to Alix's professional reputation should he fail would have resulted in a much higher hourly rate to the client had the lodestar calculation been the sole contemplated basis for compensation. The lodestar component is not so seriously overvalued by the consideration of the other components that the request is unreasonable. The wisdom of the market's willingness to invest such high stakes in turnaround efforts can legitimately be questioned, but such skepticism is not the function of the judiciary. The cost of comparable services outside bankruptcy, combined with the result obtained, justifies the compensation request, as modified by the agreement with CRSI.

■ Mr. Alix performed the role he was hired to perform in a competent and professional manner. He accomplished a remarkable job of bringing stability to a volatile situation, gave employees confidence in the future, spoke responsibly and respectfully in Court and selected highly competent persons from his own company to assist with the daily management of the debtors. His fee should be commensurate with those efforts so long as the request does not overreach in a situation where the party who must pay lacks equivalent power. True competence also has components of humility and service, especially where the performer is a fiduciary.

The Court notes that the amount agreed upon by Alix and CRSI is somewhat lower than would be expected if the cost of comparable services were the controlling factor. The agreed upon amount is more appropriate, however, because the ultimate success of this reorganization can be assured only after the passage of significant time. When all the factors are considered, the Court believes the compromised request for compensation meets the requirements of section 330.

This conclusion does not denigrate the role of the UST in protecting the interest of the public. However, the negotiated compensation was agreed to by the new owners of the debtor who were formerly the unsecured creditors of the estate. That agreement further reflects a level of compensation well within the range of reasonableness for comparable services. The Court is unaware of any provision of the Bankruptcy Code which would make such compensation unreasonable or not in the public interest. This is especially true when the statutory history clearly directs that compensation should be compatible with compensation for such services outside the Chapter 11 process.

Based on the foregoing, the objection of the UST to the Trustee's application for compensation should be, and the same is, hereby overruled. Jay Alix, as former operating trustee of the Cardinal enterprise, is awarded final compensation for services and expenses in a total amount of $2,100,-000 plus 50,000 shares of CRSI stock, restricted as set forth in the agreement between CRSI and Alix.

IT IS SO ORDERED.