**In re Q.T., INCORPORATED t/a Quick Trucks Company, Debtor.**

**Q.T., INCORPORATED, Plaintiff,**

**v.**

**THOMAS RUSSELL & COMPANY, INCORPORATED and Crestar Bank, Defendants.**

Bankruptcy No. 88–01061–RS.
Adv. No. 88–0364–RS.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

March 31, 1989.

Douglas E. Little, Robert M. Mussellman & Associates, Charlottesville, Va., for plaintiff Q.T. Inc.

John W. Pearsall, III, Richmond, Va., for defendant Thomas Russell & Co., Inc.

Deborah L. Fletcher, Hunton & Williams, Richmond, Va., for defendant Crestar Bank.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY,
Bankruptcy Judge.

This matter comes before the Court on the complaint of the debtor, Q.T., Incorporated, ("Q.T."), to determine the validity of a lien held by Thomas Russell & Company, Incorporated, ("Thomas Russell"). Based upon the evidence presented at trial and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On May 12, 1988, Q.T. filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code, and since that time has been operating as the debtor-in-possession. The debtor requested a determination that Thomas Russell did not have an enforceable lien upon the debtor's accounts receivable. The purported lien arose out of a transaction in which Thomas Russell's predecessor in interest, P.D.Q. Corporation ("P.D.Q."), sold the assets of a tractor-trailer repair business to Mr. Richard E. Bain ("Bain") pursuant to a bill of sale and assignment dated May 31, 1985. This sale specifically excluded any transfer of P.D.Q.'s accounts receivable. Under a security

agreement also dated May 31, 1985, Bain granted P.D.Q. a security interest in the assets sold to him by P.D.Q. to secure payment of a deferred purchase-money note with a principal amount of $130,000. Among the enumerated collateral the agreement included "accounts hereafter arising."[1]

Pursuant to a separate agreement between Bain and Q.T., Bain transferred all of the purchased assets to Q.T., a corporation owned wholly by Bain which previously had no assets and had conducted no business. Although there are no written documents evidencing this transfer, the parties agree it occurred on June 1, 1985. No written documents exist whereby Q.T. granted a security interest to P.D.Q.

The security agreement signed by Bain was perfected by the filing of a financing statement on June 4, 1985 in the Clerk's Office of the Virginia State Corporation Commission and on June 5, 1985 in the Clerk's Office of the Circuit Court of Hanover County. "Richard E. Bain" and "Q.T., Inc." are shown on the financing statements as debtors and both signed the statements, which list "accounts hereafter arising" among the collateral.

## CONCLUSIONS OF LAW

██ Under the Code of Virginia, a security interest is unenforceable against the debtor or a third person and does not attach unless three requirements are met:

(a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ...; and

(b) value has been given; and

(c) the debtor has rights in the collateral

Va.Code Ann. § 8.9–203(1) (Cum.Supp. 1988).

Thus, except where the creditor retains possession of the collateral, the first statutory requirement states that for a valid security interest against the debtor to exist

---

**1.** The Court notes that only Thomas Russell's purported lien in accounts receivable of the debtor is challenged here. The validity of Thomas Russell's interest, if any, in other property of the debtor is not in question.

the debtor must sign a security agreement. In *Northwestern Bank v. First Virginia Bank,* three entrepreneurs individually signed the security agreement with First Virginia Bank, but the corporate signatories were missing. The court held that since the debtor-corporation did not sign the security agreement, it failed to meet the first requirement of Va.Code § 8.9–203(1), and was unenforceable. 585 F.Supp. 425, 428 (W.D.Va.1984).

The security agreement in this case is signed by Bain, but not by the debtor. In fact, the parties have stipulated that there are no written documents by which Q.T. ever separately granted a security interest in any of its assets to P.D.Q. As stated above, under § 8.9–203(1), which has been described as a statute of frauds, a security interest is not enforceable unless the debtor has signed a security agreement. *Mid–Eastern Electronics, Inc. v. First Nat'l Bank of Southern Md.,* 380 F.2d 355, 356 (4th Cir.1967). *See also In re County Green Limited Partnership,* 438 F.Supp. 693, 696 (W.D.Va.1977). Thus, since Q.T., the debtor, never signed the security agreement, the statutory prerequisites of § 8.9–203 have not been met and, therefore, the security interest is not enforceable.

The Court is aware of a body of case law which supports Thomas Russell's contention that a secured creditor's interest cannot be defeated by a change in the debtor's name or business form. *See e.g., In re West Coast Food Sales, Inc.,* 637 F.2d 707 (9th Cir.1981); *Matter of Serrins Automotive Warehouse, Inc.,* 18 B.R. 718 (Bankr. W.D.Pa.1980); *Matter of Guaranteed Muffler Supply Co., Inc.,* 1 B.R. 324 (Bankr.N. D.Ga.1979); *American Heritage Bank & Trust Co. v. O & E, Inc.,* 40 Colo.App. 306, 576 P.2d 566 (1978); *Fliegel v. Associates Capital Co. of Delaware, Inc.,* 272 Or. 434, 537 P.2d 1144 (1975); *Inter Mountain Association of Credit Men v. The Villager, Inc.,* 527 P.2d 664 (Utah 1974).

Among these cases which support Thomas Russell's position, the facts in *West Coast* most closely resemble those presently before the Court. In that case, an individual operated a sole proprietorship known as "West Coast Sales Company." This individual entered into a security agreement which gave the creditor a security interest in the proprietorship's accounts receivable. Subsequently, a newly formed entity, "West Coast Food Sales, Inc.," "succeeded to the assets and liabilities of West Coast Sales Company," although the successor did not sign any security agreement in favor of the proprietorship's secured creditor. *West Coast, supra* at 708. This successor corporation was owned by the former sole proprietor, and the business was operated similarly before and after incorporation.

Based upon these facts, the court of appeals overturned the decision of the bankruptcy court and held "that the security agreement executed by the proprietorship continued to be effective as to the accounts receivable generated by the corporation after the change in entity status." *West Coast, supra* at 709. To decide otherwise, the court concluded, would allow a debtor "to evade the obligation of a validly executed security agreement by the simple expedient of an alteration in its business structure." *Ibid.*

This Court emphasizes that the decisions in *West Coast* and in the related cases cited above are in derogation of the plain language of § 8.9–203(1) of the Virginia Code which, as previously noted, requires a debtor's signature to appear on a security agreement before an interest may be asserted against him. Nevertheless, Thomas Russell contends that notwithstanding the law's requirements, it would be inequitable to permit Q.T. to avoid the security interest previously granted by Bain. The Court concedes that in another case it might be persuaded to follow the *West Coast* decision and agree with Thomas Russell's contention. Admittedly, the transfer of assets in the instant case from Bain to Q.T. involved merely a change in the form of business of the debtor under Thomas Russell's security agreement.

On the facts of the instant case, however, the Court declines to apply the judicial gloss of *West Coast* to § 8.9–203(1).

In contrast to *West Coast* and its companions, in this case the secured party knew a transfer of its debtor's assets to another party was to take place, and by the very language of its security agreement contemplated such a transfer. See *infra* note 2. In these circumstances, the Court concludes that Thomas Russell had the responsibility to protect itself. Because Thomas Russell was aware of the prospect of immediate disposition of its collateral, it could have required as a condition of the sale to Bain that Bain's transferee execute a security agreement. Less effective, but nonetheless protective, could have been a provision in the security agreement with Bain prohibiting dispositions of collateral outside the ordinary course of Bain's business unless the prospective transferee signed a security agreement granting a security interest to Thomas Russell. No doubt other types of protection could have been devised.

▪ The Court notes that a secured party has the primary responsibility for seeing to perfection of its security interest. *In re Trim–Lean Meat Products, Inc.,* 5 B.R. 190, 199 (Bank.D.Del.1980). *See also In re Hinson and Hinson, Inc.,* 62 B.R. 964, 968 (Bankr.W.D.Pa.1986). There is no evidence in this case that Q.T. either ignored instructions or was a recalcitrant debtor, refusing to sign papers and thereby defeating the rights of a secured party. Nor was there any allegation that the transfer from Bain to Q.T. was either fraudulent or in bad faith or in breach of contract. The Court in *Trim–Lean* held that where no fault or bad faith is shown on the part of the debtor, the lack of perfection must be borne by the creditor. *Trim–Lean, supra* at 192. In this case, at least by June 4—the day the financing statement reflecting Q.T. as a debtor was filed—Thomas Russell had knowledge of Q.T.'s existence.[2] And yet, as mentioned above, Thomas Russell pro-

duced no evidence suggesting it took any steps to protect its interest either prior to or following the transfer from Bain to Q.T. As a result of its failure to take action to protect itself, Thomas Russell does not have a valid lien against the accounts receivable of the debtor.

Of course, § 8.9–306(2) provides that a "security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and continues in any identifiable proceeds including collections received by the debtor." Va.Code Ann. § 8.9–306(2). Thus, to the extent Bain generated any accounts receivable during the interim between his purchase of the business from P.D.Q. and his transfer to Q.T., Thomas Russell's lien would continue in those transferred accounts receivable in Q.T.'s possession.[3] At trial, however, Thomas Russell failed to show that any accounts receivable were generated during the brief period, apparently a single day, that Bain operated the business. As such, the Court cannot find that Thomas Russell has a valid security interest in Q.T.'s accounts receivable by way of § 8.9–306(2).

▪ The fact that Q.T.'s name appears on the filed financing statements does not help Thomas Russell. Financing statements do not act as security agreements. A security agreement means an agreement which creates or provides for a security interest. Va.Code Ann. § 8.9–105(*l*) (Cum. Supp.1988). The Code makes no provision for a naked financing statement to be enforced as a security agreement. *In re Mann,* 318 F.Supp. 32, 34 (W.D.Va.1970). A financing statement is simply a notice that the secured party who has filed it may have a security interest in the collateral which the statement describes. *Id.* at 35.

---

2. Even earlier, Thomas Russell was aware of the possibility that Bain would transfer the business to a corporate entity. A provision of the security agreement, signed by Bain on May 31, 1985 prohibits dispositions of collateral "except transfer to a corporation of which [Bain] is the sole stockholder ..." Joint Exhibit 3, p. 2.

3. This statement is true unless Thomas Russell can be said to have authorized the transfer in its security agreement. As noted above, in footnote 2, that agreement appears to have contemplated the transfer of the assets of the business to a corporation formed by Bain for that purpose.

Various courts have held that a signed financing statement cannot operate as a security agreement. The position taken by the Fourth Circuit in *Mid–Eastern Electronics* appears to represent the prevailing view in other jurisdictions. The court there ruled that a financing statement did not create a security interest and concluded: "As the appellant can proffer no writing signed by the debtor giving ... the terms of the security agreement, [his security interest] is unenforceable." 380 F.2d at 356. *See American Card Co. v. H.M.H. Co.,* 97 R.I. 59, 196 A.2d 150, 152 (1963); *Starman v. John Wolfe, Inc.* 490 S.W.2d 377, 383 (Mo.App.1973) (financing statement does not qualify as a security agreement). *Cf. Matter of Bollinger Corp.,* 614 F.2d 924, 926–28 (3d Cir.1980).

Thomas Russell asserts that it seems likely that both parties *intended* it to have a security interest in the accounts receivable. In *Shelton v. Erwin,* 472 F.2d 1118, 1120 (8th Cir.1973), the parties intended, and even attempted to create, a security interest in favor of Erwin. The *Shelton* court, in holding that a showing of intent could not excuse the parties' failure to comply with the law's strict requirements, followed the similar case of *Safe Deposit Bank & Trust Co. v. Berman,* 393 F.2d 401, 404 (1st Cir.1968) and stated: "The result is commanded by the necessary technicalities inherent in any law governing commercial transactions.... To the extent that the legal significance of documents may be varied and enlarged by other documents ..., we suspect that the law of commercial transactions will not achieve its stated purposes. The basis of the trouble here is that appellee used an inappropriate form to do what it apparently wished." 472 F.2d at 1120. In the instant case, Thomas Russell failed to protect itself by permitting Bain to transfer the business without having a security agreement signed by Q.T., and, regardless of the intent of the parties, its lien is not valid.

For the reasons stated, this Court must find for the plaintiff, Q.T., in this matter and hold that Thomas Russell does not have a valid lien against the accounts receivable of the debtor.

An appropriate Order will issue.