**In re Dorothy E. LEFTWICH, Debtor.**

**Bankruptcy No. 93–01534.**

United States Bankruptcy Court,
W.D. Virginia,
Lynchburg Division.

Feb. 3, 1994.

Stephen E. Dunn, Lynchburg, VA, for debtor.

James J. Sakolosky, Lynchburg, VA, for Schewel Furniture Co., Inc.

Laurence P. Morin, Trustee, Lynchburg, VA.

## *MEMORANDUM OPINION*

WILLIAM E. ANDERSON, Bankruptcy Judge.

Before the court is an objection filed by Schewel Furniture Company, Inc. (Schewel) to confirmation of the chapter 13 plan of debtor Dorothy E. Leftwich.

### FACTS

The debtor has purchased a number of items of furniture from Schewel pursuant to installment sale agreements over the past few years. The earliest relevant contracts are two dated October 14, 1991. One indicates that the debtor financed the purchase of a washer, dryer, carpeting and extended warranties for a cash price, including sales tax, of $1,267.59. She was charged $167.51 for life and property insurance and refinanced an existing debt of $656.82 for installment purchases made previously. The contract provided for an annual interest rate of 24.9 percent, granted Schewel a purchase money security interest in the items purchased, and provided for retention of Schewel's purchase money security interest in previously purchased goods.

Pursuant to a second October 14, 1991 contract containing the same terms, the debtor also purchased a sofa and a wing chair for a cash price, including tax, of $1,332.38. After adding this amount to the previous total and including the finance charges, the debtor owed Schewel a total of $4,085.20 as of October 14, 1991 which was to be paid in 28 monthly installments of $145.90 beginning on November 20, 1991.

On October 23, 1992 the debtor refinanced her account with Schewel. All of the terms of the new contract were the same as the October 14, 1991 contracts except that it called for 23 monthly installment payments of $121.12.

By contract dated March 16, 1993, the debtor purchased a china unit, a corner unit, a hall tree and floral arrangement from Schewel for a cash price including tax of $1,050.23. The terms were the same as in the prior contracts. After paying $250.00 down, the debtor owed Schewel a total of $3,541.44, including finance charges, which was to be paid in 24 monthly installment payments of $147.56. The debtor apparently did not sign the original of this contract although she did sign the copy which accompanied the delivery of the items purchased.

On March 20, 1993, the debtor purchased a wing chair for $156.75. The unpaid balance was again consolidated with the net unpaid balance from the previous contracts. The contract terms remained the same.

The debtor filed a chapter 13 bankruptcy petition and plan on October 6, 1993. On Schedule D filed with her petition, she listed a $2,900.00 debt owed to Schewel Furniture of which $2,450.00 was shown as unsecured. She also indicated that Schewel had a lien on a sofa, chair, washer, and dryer, and that the collateral had a market value of $450.00. On the Statement of Intention filed with the petition, the debtor stated that she intended to retain the sofa, chair, washer, and dryer and reaffirm her obligations regarding those

items. The debtor claimed no exemptions on Schedule C.

In her chapter 13 plan which she filed with her petition, the debtor listed the $2900.00 debt to Schewel and stated that she intended to pay in full only the value of the collateral, which she listed as $450.00, and that the balance would be treated as an unsecured debt. The plan also provided that

> "[d]ebtor is aware of the condition of the collateral and knows its value. On the Plan filing date, the property has the value set forth below. The value is based upon disposition of said property in a commercially reasonable manner."

On October 8, 1993, a notice of the commencement of the debtor's bankruptcy case was mailed to the creditors and a one page summary of her chapter 13 plan was enclosed. The summary indicated that unsecured creditors would be paid 30% of their allowed claims and stated that the chapter 13 trustee would pay Schewel as a secured creditor $450.00 as the fair market value of the sofa, chair, washer and dryer which was the collateral for the debt.[1] The notice provided that objections to confirmation of the plan should be filed five days prior to the November 19, 1993 confirmation date.

On October 25, 1993 Schewel filed an objection to confirmation of the debtor's plan, stating that the balance owed to it as of October 1, 1993 was $2,936.17, that the value of the collateral was at least $1,425.00, not $450.00, and that the plan did not provide for the payment of interest on the secured portion of the debt. Schewel suggested that the proper rate of interest should be the contract rate of 24.93%. Attached to the objection were copies of Schewel's consumer credit contracts with the debtor which are described above.

On November 10, 1993, the chapter 13 trustee filed a report recommending that the plan be confirmed as originally filed subject to resolving Schewel's objection regarding the value of the collateral. On November 16, 1993, however, the debtor filed an amended plan which stated that:

> Schewels, which is secured by a wing back chair, shall be paid by the chapter 13 trustee $150.00 at an interest rate of 10% over a 12 month period.

The confirmation hearing on the debtor's plan was held on November 18, 1993. Counsel for Schewel and the debtor appeared and argued. The court reserved its decision after the hearing pending the submission of memoranda of law.

### DISCUSSION

Schewel argues that it holds a purchase money security interest in all of the items which the debtor purchased except for the dryer and carpet purchased on October 14, 1991, which have been paid for in full. If Schewel is correct, in order for the debtor's chapter 13 plan to be confirmed it must provide either for the payment of the present value of Schewel's claim to the extent it is secured by the debtor's property or for the surrender of the collateral to Schewel. *See* 11 U.S.C. §§ 506(a) and 1325(a)(5)(B)(ii).

The debtor argues that Schewel is not the holder of a purchase money security interest in any of the collateral except perhaps the wing chair purchased on March 20, 1993. This is so in her view because each time the unpaid balance of a new purchase was consolidated with that of previous purchases, Schewel's security interest became a nonpurchase money security interest. Because it is necessary to file a financing statement in order to perfect a nonpurchase money security interest,[2] and since none was filed, the

---

1. In *In re Linkous*, 990 F.2d 160, 162–63 (4th Cir.1993), the Fourth Circuit held that pursuant to 11 U.S.C. § 506(a) and Federal Rule of Bankruptcy Procedure 3012, notice should be given to the affected creditor when the debtor intends to "reevaluate the secured claims pursuant to § 506(a)." The court also cited *In re Calvert*, 907 F.2d 1069, 1072 (11th Cir.1990), in which the Eleventh Circuit held that while a § 506(a) valuation hearing may be held in conjunction with a confirmation hearing, "[m]ere notice that the

bankruptcy court will hold a confirmation hearing on a proposed bankruptcy plan, without inclusion of notice specifically directed at the security valuation process, does not satisfy the requirement of Rule 3012."

2. Va.Code § 8.9–302 provides that it is necessary to file a financing statement in order to perfect all security interests except for certain listed exceptions. Among the exceptions is a purchase

debtor asserts that Schewel is actually unsecured.

Alternatively, the debtor argues that even if combining purchase money debt with non-purchase money does not destroy purchase money security interest status, Schewel is nevertheless unsecured except for an interest in the chair purchased on March 20, 1993. She claims this is so because she did not sign the March 16, 1993 contract. Since the March 16th contract replaced all her previous contracts, her failure to sign destroyed any possible Schewel security interests in the previously purchased property. The debtor asserts that she is entitled to keep the chair purchased on March 20th in which Schewel does have a purchase money security interest because she proposes to pay its full value under her amended chapter 13 plan.

### A. Does Schewel have a purchase money security interest in any of the debtor's property?

Although the term "security interest" is defined in the Bankruptcy Code as a "lien created by an agreement," the Code does not define purchase money security interest. *See* 11 U.S.C. § 101(51). That term is defined, however, in Section 9–107 of the Uniform Commercial Code which states that:

[A] security interest is a "purchase money security interest" to the extent that it is (a) taken or retained by seller of the collateral to secure all or part of its price; or (b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

*See, e.g.,* Va.Code § 8.9–107. Section 9–204 of the U.C.C. also expressly permits a creditor to include both an after-acquired property clause and a future advances clause in a security agreement.[3] The U.C.C. says nothing, though, about whether a seller retains a purchase money security interest in the original collateral when such a clause is exercised or in any other instance when debt created by the purchase of property is refinanced or consolidated with debt incurred in other transactions.

Schewel argues that Va.Code § 8.9–204.1,[4] by implication if not directly, creates a safe harbor for retaining purchase money security interest status. Section 8.9–204.1, which by its terms applies only to sales of consumer goods, allows sellers to take a security interest only in the goods sold. In doing so it creates an exception to the general rule that security interests can be created by agreement in any property belonging to a debtor. Section 8.9–204.1 further provides that when a seller sells and takes a security interest in consumer goods, and where the unpaid debts from two or more sales of consumer goods are consolidated into a single debt and the new debt remains secured by the goods sold, the payments must be applied in a certain manner. If the terms of a security interest subject to § 8.9–204.1 do not comply with the

---

money security interest in consumer goods. *See* Va.Code § 8.9–302(1)(d).

3. *See, e.g.,* Va.Code § 8.9–204.

4. Va.Code § 8.9–204.1 provides in relevant part as follows:

§ 8.9–204.1. **Security interests in consumer goods.** (a) Notwithstanding any other provision of the law to the contrary, a seller may take a security interest only in goods sold; provided, however, this section shall apply only to the sale of consumer goods as defined in § 8.9–109(1). Where the unpaid debts from two or more sales of consumer goods are consolidated into one debt payable on a single schedule of payments, and the consolidated debt is secured by security interests in the consumer goods sold, the payments made by the debtor under the consolidated schedule may be applied to the payment of the

debts arising from the sales either (1) in the order in which the sales were made, starting with the first sale, or (2) in the same proportion as the original debts arising from the various sales bear to one another. To the extent debts are paid according to this section, security interests in the consumer goods will terminate as the debt originally incurred with respect to each item is paid.

(c) A security interest created in violation of this section is void.

No state other than Virginia includes a provision like Va.Code § 8.9–204.1 in Article 9 of its version of the U.C.C. Such provisions are more often found in Installment Sales Acts such as the Pennsylvania Goods and Services Installment Sales Act, PA.STAT.ANN. tit. 69, §§ 1101–2303 or the North Carolina Installment Sales Act, N.C.GEN.STAT. § 25A–1, *et al.*

terms of the statute, the interest is void. *See In re Penny,* 15 B.R. 124, 126 (Bankr. E.D.Va.1981).

Section 8.9–204.1 does not expressly provide that the interest which is protected by compliance with its provisions is necessarily a purchase money security interest as defined in Va.Code § 8.9–107(a). However, nothing in § 8.9–204.1 indicates that refinancing a consumer purchase precludes retaining a purchase money security interest and the fact that Virginia enacted the provision as part of Article 9 of the U.C.C. supports a finding that a refinancing or consolidation does not automatically destroy an existing purchase money security interest.

Numerous courts, particularly since the Bankruptcy Code became effective in 1978,[5] have considered whether a security interest loses its purchase money status when a secured party consolidates or refinances the debt pursuant to which the interest was originally created.[6] Some, adopting what has come to be called the "transformation" rule, hold that the refinancing or consolidation automatically extinguishes the purchase money character of the original loan. The rationale for the transformation rule is that a single security interest cannot secure both purchase money and nonpurchase money debt. Therefore, consolidating or combining purchase money debt with nonpurchase money debt, transforms it into nonpurchase money debt. *See, e.g., In re Manuel,* 507 F.2d 990, 993–94 (5th Cir.1975) ("the purchase money security interest cannot exceed the price of what is purchased in the transaction wherein the security interest is created"). Some courts applying the transformation rule apparently hold that even inclusion of an after-acquired property or future advances clause in a security agreement converts a purchase money security interest into an ordinary security interest. *See Southtrust Bank of Ala. v. Borg–Warner Acceptance Corp.,* 760 F.2d 1240 (11th Cir.1985).

A similar result is reached by other courts which hold that a refinancing of a purchase money security interest constitutes a novation or new loan, thereby destroying purchase money status instead of simply changing the terms of the original loan. *See, e.g., In re Matthews,* 724 F.2d 798, 800–01 (9th Cir.1984) (refinancing transaction in effect viewed as a novation, as if a new loan was created to pay off an "antecedent debt"). The novation theory is sometimes viewed as simply another rationale for the transformation rule but, unlike the *per se* nature of the transformation rule which applies whenever purchase money debt is combined with nonpurchase money debt, a novation need not be found if a refinancing can be characterized as an extension or modification of the original loan or if the parties agree that there will be no novation.[7]

Courts in many of the more recent opinions hold that a security interest can in fact have a "dual-status." Under this theory a single security interest can secure both purchase money and nonpurchase money debt as long as it is possible to distinguish the part of the debt which is purchase money from the part that is not, and to allocate payments accordingly. *See, e.g., Pristas v. Landaus of Plymouth, Inc.,* 742 F.2d 797, 800–01 (3rd Cir.1984); *In re Billings,* 838 F.2d 405, 409 (10th Cir.1988) and *In re Ionosphere Clubs, Inc.,* 123 B.R. 166, 171–73 (S.D.N.Y.1991). The "dual-status" rule is derived from the language in Uniform Commercial Code § 9–107 which states that a security interest is a purchase money security interest "to the extent" that it is taken or retained by the seller of the collateral to secure all or part of its price. *See, Pristas* at 800–01.

---

5. The question of whether refinancing or consolidating loan destroys a purchase money security interest usually arises in bankruptcy in actions to avoid liens pursuant to 11 U.S.C. § 522(f)(2). That provision gives a debtor the right to avoid a nonpossessory, nonpurchase-money security interest in certain household and other goods if the lien impairs an exemption to which the debtor would otherwise be entitled under § 522(b).

6. *See,* R. Lloyd, "Refinancing Purchase Money Security Interests," 53 Tenn.L.Rev. 1, 48–63 (1985) and "Consolidated and Refinanced Purchase Money Loans under the Bankruptcy Code and the Uniform Commercial Code," 45 *Cons. Fin.L.Q.Rep.* 69 (Winter, 1991) in which the cases and the reasoning underlying them are carefully analyzed.

7. See, R. Lloyd, 45 *Cons.Fin.L.Q.Rep.* 69, 72 (Winter 1991).

Still other courts purport not to adopt the transformation, novation, or dual status theory and hold that the intent of the parties determines whether a refinanced debt will retain its purchase money character. *See, e.g., In re Adoptante,* 140 B.R. 940 (Bankr. D.R.I.1992) and *Stevens v. Associates Financial Services,* 24 B.R. 536 (Bankr.D.Colo. 1982).

Although this court agrees with the Third and Tenth Circuits that the dual status theory comports best with the language and underlying intent of both Article Nine of the U.C.C. and the Bankruptcy Code, the Fourth Circuit in *Dominion Bank of the Cumberlands, NA v. Nuckolls,* 780 F.2d 408 (4th Cir.1985), used a different approach. In *Nuckolls,* debtors used the proceeds from separate $2500 and $3500 bank loans to purchase restaurant equipment and inventory. A few months later, before they made any payments on the loans, they received another $7094.07 loan from the same bank. The proceeds from the latter loan were used to pay off the previous two loans and to provide the debtors with $1000 in cash. The debtors executed an agreement securing the November loan pledging the earlier purchased equipment, inventory, accounts receivable, and cash. Subsequently, in the debtors'

bankruptcy proceeding, the bank argued that it held a purchase money security interest in the collateral. The Fourth Circuit disagreed and held that for purposes of 11 U.S.C. § 522(f)(2) [8] the bank did not hold a purchase money lien because its security interest:

> secures a loan made to refinance a pre-existing debt—not to acquire collateral. The "refinancing or consolidating [sic] loans by paying off the old loan and extending a new one extinguishes the purchase money character of the original loan because the proceeds of the new loan are not used to acquire rights in the collateral."

*Id.* at 413. As authority, *In re Matthews, supra,* at 800; *Rosen v. Associates Financial Services,* 17 B.R. 436, 437 (D.S.C.1982); *In re Jones,* 5 B.R. 655 (Bankr.M.D.N.C.1980) and U.C.C. § 9–107(b), Official Comment 2 [9] are cited.

Although the *Nuckolls* opinion does not refer to either the novation or transformation theory, it appears from the language used and the holdings of the cases cited that the court was adopting a novation approach to determining in which instances a loan refinancing or consolidation transaction destroyed purchase money security status.[10]

---

**8.** No case or commentator has suggested that a special or different definition of purchase money security interest should be used for purposes of § 522(f)(2). It should be noted, however, that one of the arguments sometimes made in favor of adopting the dual status rule is that it better reflects the policy underlying § 522(f)(2) of preventing creditors from overreaching by obtaining and attaching liens on household possessions already owned by a debtor which could otherwise be exempt from bankruptcy while at the same time not eliminating security interests in newly purchased items. *See, e.g., Billings, supra,* at 409–10.

**9.** Official Comment 2 of U.C.C. § 9–107 provides as follows:

2. When a purchase money interest is claimed by a secured party who is not a seller, he must of course have given present consideration. This section therefore provides that the purchase money party must be one who gives value "by making advances or incurring an obligation": the quoted language excludes from the purchase money category any security interest taken as security for or in satisfaction of a preexisting claim or antecedent debt.

Arguably this comment has nothing to do with secured parties who are sellers but instead applies only to third party financiers who must give present consideration in order to obtain purchase money security interest status. Construing this provision to prevent the retention of purchase money security interests changes the traditional rule that conditional sales and purchase money chattel mortgages are valid even though they secure other debt. It seems unlikely that the U.C.C. drafters would have made such an important change in the existing law in such an indirect manner. *See* R. Lloyd, "Refinancing Purchase Money Security Interests," 53 *Tenn. L.Rev.* 1, 56, at note 234.

**10.** In *Jones,* which the Ninth Circuit in *Matthews* called the seminal case in the area, the Bankruptcy Court discussed what has come to be called the transformation rule, but stated that it was not relying on cases decided using that theory. Instead the court, without stating source of the law it was applying, held in effect held that a novation had occurred in which an old debt was paid off and a new nonpurchase money debt substituted for it.

*Rosen* relied upon *Jones* and expressly declined to follow *In re Slay,* 8 B.R. 355 (Bankr.E.D.Tenn.

Interestingly, however, although *Nuckolls* arose in Virginia, the Fourth Circuit does not refer to Virginia novation law (nor did the *Jones* opinion refer to North Carolina law in determining whether a novation had occurred).

There are apparently no cases decided using Virginia law which post-date *Nuckolls*. Under Virginia law "[a] novation is a substitution by mutual agreement of one debtor for another or one creditor for another, whereby the old debt is extinguished, or the substitution of a new valid obligation for an existing one, which is thereby extinguished." *Dillenberg v. Thott*, 217 Va. 433, 229 S.E.2d 866, 868 (1976). In order for a novation to occur, all parties involved in a transaction must be shown to have clearly and definitely intended to effect one. *See, e.g., Gullette v. Federal Deposit Insurance Corporation*, 231 Va. 486, 344 S.E.2d 920, 922 (1986). Even the fact that a promissory note is stamped "paid by renewal" is not sufficient to circumstantially establish a novation. *Id.* 344 S.E.2d at 922–23.

▉ The facts in *Nuckolls* are distinguishable from the facts in the matter before this court. There is no evidence that the parties to the transactions at issue in this case intended that each refinancing constitute a novation of previous agreement(s). To the contrary, paragraph 4(b) of each agreement states that

> ... in consideration of the refinancing or adjustment of payments due on prior contracts, Debtor agrees that the security interests granted in said prior contracts shall remain in full force and effect and in the case of consumer goods, payments made as set forth on the reverse side hereof shall be applied at the option of Secured Party either (a) in the order in which sales were made, or (b) in the same proportion as the original debts arising from the various sales bear to one another and to the extent

the indebtedness is so paid security interests in consumer goods sold will terminate. In the case of items of consumer goods purchased on the same day, the lowest priced items shall be deemed first paid for.

This court therefore finds that the transactions at issue in this case did not constitute novations of the prior transactions. This, and the fact that the Installment Sale and Security Agreement used by Schewel provided for the debtor's payments to be applied to the loan balance in accordance with the provisions of Va.Code § 8.9–204.1, means that Schewel retained a purchase money security interest in all of the property in which it claims such an interest.

The debtor disagrees and argues that this court should follow the decision of the Bankruptcy Court for the Eastern District of Virginia in *In re Penny, supra,* citing that court's statement that "[w]hen items which were previously purchased and covered by an earlier purchase security interest are consolidated into a new purchase money security and stand as security for the purchase price of items subsequently purchased, the instrument is no longer a purchase money security instrument, ... ." *Id.* at 127. This court declines to follow *Penny* for several reasons. First, the quoted language is dictum. In *Penny* the lender failed to comply with the provisions of Va.Code § 8.9–204.1, thereby making its security interest void. The court's subsequent discussion of whether the security interest was a purchase money or nonpurchase money interest was therefore irrelevant. This court disagrees with the *Penny* opinion to the extent that it indicates that the lender could have preserved a nonpurchase money security interest by filing a financing statement, even though it did not comply with Va.Code § 8.9–204.1. Second, *Penny* was decided before *Nuckolls* and cites non-Virginia cases in support of the quoted

1980), one of the earliest "dual status" cases, even though the court found *Slay* "defensible from an equitable standpoint." *Rosen,* at 437–38.

Although the Ninth Circuit in *Matthews* does not specifically state that a novation occurred, it seems clear that the holding is based on that theory, the court stating at p. 801 that "[t]he

argument that, under California law, novation does not occur without the express intent of the parties is not helpful to Transamerica, but rather supports our conclusion." The court also appears to reject the transformation theory in footnote 3 and does not expressly address the "dual status" rule.

proposition not relied upon by the Fourth Circuit.

B. *Does the fact that the debtor did not sign the original of the March 16, 1993 contract destroy Schewel's security interest in the items purchased on and prior to that date?*

The debtor argues that regardless of whether the security interest retained by Schewel after refinancing would otherwise be entitled to purchase money status, the fact that her signature does not appear on the original March 16, 1993 contract destroyed Schewel's interest in all items purchased on or before that date. The debtor does not deny that she purchased and retains the merchandise shown on the March 16, 1993 contract. Nor does she dispute Schewel's assertions that the failure to obtain her signature on the original copy of the contract was inadvertent, that she did sign the delivery copy, and that she intends to keep the furniture purchased pursuant to the March 16, 1993 contract.

Pursuant to Va.Code § 8.9–203(1),[11] the debtor must sign a security agreement in order for it to be enforceable unless the creditor retains possession of the collateral. This provision serves an evidentiary function, minimizing the possibility of a future dispute about the terms of the security agreement. *See, e.g., Whitmore & Arnold, Inc. v. Lucquet,* 233 Va. 106, 353 S.E.2d 764, 766 (1987) and *In re Mann,* 318 F.Supp. 32, 35 (W.D.Va. 1970).

There is no dispute in this case regarding either the terms of the security agreement, the property intended to serve as collateral, or the intent of the debtor to be bound. Schewel argues that given that the debtor does not dispute any relevant fact regarding her purchases and the intent of the parties, the fact that she signed the delivery copy of the March 16, 1993 contract is sufficient to meet the signing requirement of Va.Code § 8.9–203(1)(a).

There are no Virginia cases directly on point. Most cases dealing with the signing requirement in Virginia and elsewhere involve security agreements that are signed, but not by the party against whose property the lien is asserted.[12] There are, however, two cases from other jurisdictions which support Schewel's position. In *In re Wiegert,* 145 B.R. 621, 18 U.C.C.Rep.Serv.2d 1240 (Bankr.D.Neb.1991), the court held that even though a debtor did not sign a Sears Charge Security Agreement, Sears nevertheless had a valid security interest because the debtor signed a sales slip which contained the essential terms of a security agreement.[13] Similarly, in *In re Ziluck,* 139 B.R. 44 (S.D.Fla. 1992), the District Court, reversing the Bankruptcy Court, held that a debtor's signature on the front of a lender's credit card application directly below a statement providing that he had read the lender's security agreement and agreed to its terms was sufficient to comply with the signature requirement of U.C.C. § 9–203(1)(a) even though the debtor did not sign the security agreement itself, which was on the back of the application and did not contain a blank for

11. Va.Code § 8.9–203 provides in relevant part as follows:

   **§ 8.9–203. Attachment and enforceability of security interest; proceeds, formal requisites.—** (1) ... [a] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

   (a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned; and

   (b) value has been given; and

   (c) the debtor has rights in the collateral.

   (2) A security agreement attaches when it becomes enforceable against the debtor with re- spect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) of this section have taken place unless explicit agreement postpones the time of attaching.

   (3) ...

12. *See, e.g., Q.T., Inc. v. Thomas Russell & Co.,* 9 U.C.C. Reporting Serv.2d 433 (E.D.Va.1989), *rev'g In re Q.T., Inc.,* 99 B.R. 310 (Bankr.E.D.Va. 1989), in which the court held that a security agreement signed by an individual was binding upon a corporation which he subsequently formed.

13. The court also held that Sears' security interest did not lose its purchase money status even though subsequent purchases were made on the account.

signing. In both cases it appears that all parties agreed that the parties intended to create a purchase money security interest.

Similarly, given the circumstances in this case, this court finds that the debtor's signature on the delivery copy of the installment sale and security agreement satisfies the signature requirement of Va.Code § 8.9–203(1)(a).

### C. Can the debtor's amended chapter 13 plan be confirmed?

 Because Schewel has a purchase money security interest in property owned by the debtor, her amended chapter 13 plan cannot be confirmed over Schewel's objection. The plan must either provide for the surrender of the property or, pursuant to 11 U.S.C. §§ 506(a) and 1325(a)(5)(B)(ii), provide for the payment of the value of any allowed secured portion of Schewel's claim.

In its objection to the debtor's original chapter 13 plan, Schewel states that if the property subject to the purchase money security interest is retained, the debtor will need to pay interest on the allowed secured claim in order to comply with § 1325(a)(5)(B)(ii). Schewel then proposes that a proper discount rate of interest would be the 24.93% that is provided for in the installment sale and security agreements which it entered into with the debtor. The Fourth Circuit has addressed the question of how to determine an appropriate rate of interest for purposes of § 1325(a)(5)(B) in *United Carolina Bank v. Hall,* 993 F.2d 1126, 1130–31 (4th Cir.1993). While that decision indicates that as a matter of equity the contract rate of interest is the highest rate that should be used, the opinion does not automatically justify use of the contract rate for purposes of § 1325(a)(5)(B).

### CONCLUSION

Neither the relevant provisions of Article Nine of the Uniform Commercial Code nor those of the Bankruptcy Code require or even suggest adoption of a *per se* rule that combining purchase money with nonpurchase money debt always destroys a purchase money security interest. Although this court finds particularly persuasive the many deci-

sions which adopt what is called the dual status theory and hold that purchase money status should be preserved to the extent that the collateral secures its own purchase price and that a proper method for allocating payments is provided, the Fourth Circuit has indicated that whether a purchase money security interest survives a refinancing or consolidation depends upon whether the transaction constitutes a novation. The parties in this case did not intend that each transaction they entered into constituted a novation of their prior transactions. It is clear that they intended that Schewel retain a security interest in all of property purchased to the extent of its purchase price. For these reasons, and because the installment sale and security agreement used by Schewel provides a method of allocating payments that complies with the requirements of Va.Code § 8.9–204.1, Schewel holds a valid purchase money security interest in part of the property which the debtor purchased from it.

The fact that the debtor signed only a delivery copy of the March 16, 1993 installment sale and security agreement does not change this result. An order will therefore be entered sustaining the objection made by Schewel to confirmation of the debtor's amended chapter 13 plan.